**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1380

SHAWNA CANNON LEMON,

　　　　　Plaintiff – Appellant,

v.

MYERS BIGEL, P.A., f/k/a Myers Bigel & Sibley and Myers Bigel Sibley & Sajovec, P.A.; LYNNE A. BORCHERS; UNNAMED OTHERS,

　　　　　Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:18-cv-00200-FL)

Argued:  December 9, 2020　　　　　　　　　　Decided:  January 19, 2021

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

**ARGUED:**  Steven Wayne Seymour, SAMUELS YOELIN KANTOR LLP, Portland, Oregon; John Heydt Philbeck, BAILEY & DIXON, Raleigh, North Carolina, for Appellant.  Kerry A. Shad, Isaac Augustin Linnartz, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:**  Brandon S. Neuman, Nathaniel J. Pencook, SHANAHAN LAW GROUP, Raleigh, North Carolina, for Appellant.

WILKINSON, Circuit Judge:

Appellant Shawna Lemon practiced patent law at Myers Bigel (MB), first as an associate and then as a shareholding partner and equal owner of the firm. Around ten years after her elevation to MB's partnership and its Board of Directors, Lemon applied for short-term leave. A vote of the full Board, however, found Lemon did not qualify for the leave. Interpreting this denial, and certain events that followed, as driven by retaliatory and race-based motivations, Lemon resigned. She then filed suit, alleging claims of race- and gender-based discrimination under Title VII and racial discrimination under § 1981.

The problem was that Lemon, an equity partner at MB, was not an "employee" of the firm she sought to sue. Pressed at argument, Lemon could not identify any Title VII case authority that supported her position, but stated that the law must make room for novelty. While we respect her candor, we are unable to embrace the novelty and thus affirm the trial court's dismissal of her action.

I.

This case presents a challenge to a dismissal for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), and we thus take the facts as pleaded to be true. *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).

In 2001 Lemon, an African-American attorney, joined MB as an associate. The terms of her at-will employment agreement were unremarkable. She was bound *inter alia* to "comply with the personnel policies . . . and all other rules and regulations of the employer," as well as to "carry out . . . orders, directions, and policies stated by the

2

employer . . . either orally or in writing." J.A. 68–72. MB reserved "complete control and authority with respect to the acceptance or refusal of any client and the amount of any fee charged." *Id.*

When Lemon executed a shareholder agreement in 2007, whereby she purchased 5,000 shares of MB for approximately $62,241, her relationship to the firm changed. She was no longer an associate, as the agreement elevated her to partnership status. She owned the same share of the firm as all other partners, and the voting power of her seat on the firm's Board of Directors was likewise the same. Like all other partners, she was compensated according to a formula whose output varied with the profits and losses of the firm. She was subject to MB's shareholder quality control policy, which mandated that each shareholder submit her work product to another shareholder for substantive review. And finally, she became equally eligible to serve on the Board's Management Committee—which she did, in 2011—and in MB's officer positions—which she did, as Vice President and Secretary, in 2016. Although the shareholder agreement never formally superseded the employment agreement, the Board voted, while Lemon was a partner, to strip from the shareholder agreement all references to shareholders as MB "employees."

In 2016, MB hired an outside attorney to investigate gender discrimination at the firm. Lemon requested permission to view the memorandum summarizing the investigation's findings prior to its circulation to the full Board. This request was denied, and Lemon hired an attorney to "assist and advise her in connection with" the investigation. J.A. 442. When this fact, as well certain statements she made during her interview with the investigating attorney, became known to the Board, relationships between Lemon and

3

several of MB's other partners soured. Shortly after the June 2016 meeting in which the Board discussed the investigating attorney's full report, one shareholder allegedly remarked to another that Lemon "played the black card too much." J.A. 444.

Later in that same year, Lemon submitted a request for short-term leave. Beyond stating that she qualified "through her own health condition" as well as through "two additional qualifying events that were experienced" by her immediate family, Lemon declined to specifically identify these allegedly qualifying conditions before this court or before the court below. J.A. 447. The Board, which did learn the specifics—whatever they may be—was unsympathetic. Lemon alleges that after directing her to leave the meeting so that "members could more freely discuss discriminatory and retaliatory acts," the full Board, which included Lemon, reconvened and voted 17-3 to deny Lemon's request. According to Lemon, this process represented a stark departure from the customary handling of short-term leave applications filed by white attorneys, whose requests were allegedly "ministerially confirm[ed]" by the Management Committee. J.A. 458.

Subsequent to this denial, Lemon alleges that shareholder Borchers, a member of the Management Committee and allegedly the most powerful of MB's partners, spoke to other members of the Board about "punish[ing]" Lemon for "bad behavior." J.A. 451. Lemon also alleges that the Management Committee had "openly discussed racial and gender discrimination and its retaliatory actions against Lemon," including termination of her employment. J.A. 455. She alleges that she was "interrogated" by other shareholders and that her conduct would be under discussion at a future board meeting. *Id.* Overcome

4

by what she characterized as the "extraordinary stress [and] humiliation" of her workplace environment, Lemon resigned. J.A. 456.

Lemon then haled her former law firm into court. She claimed that MB had discriminated and retaliated against her in violation of Title VII and that it had discriminated against her on the basis of race, in contravention of § 1981. MB did not share this view of events. In light of Lemon's status as a partner and co-equal owner, MB did not believe that Lemon's claim to be an MB employee accurately reflected the significance of her rights and responsibilities at the firm. Def.'s Mot. Dis. 6–9, 9 n.7, ECF No. 18. MB also denied that the Board's decision to reject her short-term leave request was in any way motivated by racial bias. *Id.* at 10–12. To the contrary, MB characterized several of Lemon's allegations on that score as wholly lacking a factual basis. *Id.*

The district court dismissed both claims.[1] Lemon's Title VII claim failed, the court held, because she had failed to allege sufficient facts to demonstrate that she was an employee of MB, and therefore within the scope of Title VII's protections. The district court dismissed her § 1981 claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), on the grounds that the facts she pled could not support a plausible inference that MB's decisions were motivated by race.

---

[1] Lemon also filed claims under North Carolina state law for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing. Because Lemon declined to appeal the district court's dismissal of these claims, they are not discussed herein.

## II.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," or from discriminating "against any of his employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C § 2000e-2(a), 3(a). As the text makes clear, the protections of Title VII's anti-discrimination and anti-retaliation provisions extend only to employees. In focusing on employees, and the terms and conditions of employment, Congress chose to protect those least able to combat the effects of invidious discrimination in the workplace. The threshold inquiry in any Title VII case must, therefore, be whether the plaintiff alleging unlawful discrimination or retaliation is, in fact, an employee.

Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000(e)(b). This definition is short on substance. In such instances, where a statute's definition of "employee" is "completely circular and explains nothing," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992), the Supreme Court has stated that Congress's words should be interpreted to "describe the conventional master-servant relationship as understood by common-law agency doctrine," *Clackamas Gastroenterology Associations, P.C. v. Wells*, 538 U.S. 440, 445 (2003) (quoting *Darden*, 503 U.S. at 322). *Clackamas* further specified that the "principal guidepost" for courts applying the principles of agency doctrine must be "the common-law element of control." *Id.* at 448. And finally, *Clackamas* gauged control through a set of six non-exhaustive factors:

6

[1] Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work . . . [2] Whether and, if so, to what extent the organization supervises the individual's work . . . [3] Whether the individual reports to someone higher in the organization . . . [4] Whether and, if so, to what extent the individual is able to influence the organization . . . [5] Whether the parties intended that the individual be an employee, as expressed in written agreements and contracts . . . [6] Whether the individual shares in the profits, losses, and liabilities of the organization.

*Id.* at 449–50 (internal citations and quotations omitted). Courts are responsible for merging these factors into a judgment that embraces all the circumstances presented in a particular case. *See id.* at 450 n.10. And circuits relying on *Clackamas* to resolve disputes similar to the present one have not deviated from the "principal guidepost" of common-law control. *See, e.g.*, *von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139 (8th Cir. 2019); *Solon v. Kaplan*, 398 F.3d 629 (7th Cir. 2005).

This is unsurprising, because the foundational principles in this area of law are well-settled and the *Clackamas* factors are manifestly well-suited to their expression. *Murray's Case*, 154 A. 352 (S.J.C. Me. 1931), an almost century-old chestnut of agency law, invoked the master-servant concept to distinguish employees from non-employees by asking who possessed the right to "control the progress of the work." 154 A. at 354. Even through the transition between the Second Restatement of Agency, which substantially embraced the framing of *Murray's Case*, and the Third Restatement, which fittingly retired terms like "master" and "servant," the underlying notion of control has always retained primacy. *See* Restatement (Second) of Agency § 220 (1933); Restatement (Third) of Agency § 7.07(f) (2006).

7

*Clackamas* approaches the employer-employee distinction in accord with this tradition. Responding to the rise of corporately-structured professional partnerships in fields like medicine and law, *see Clackamas*, 538 U.S. at 446–47, *Clackamas* represents the smooth and coherent development of familiar doctrinal principles regarding control and its indicia. In light of this continuity, we do not find it necessary to embroider the *Clackamas* factors to decide this case. We need only apply them.

And the facts of this case hardly make that task a difficult one. As a partner and co-equal owner of MB, with an equal vote on all matters substantially impacting the firm, Shawna Lemon was not an employee. To hold otherwise would be to stretch the concept of "employee" well past its breaking point and needlessly upend understandings that have been central to the organization of firm partnerships for decades.

Consider, to start, that Lemon served as a partner within a structure, entirely typical among law firms, that recognized no higher rank or responsibility. Like every other full partner at MB, she owned 5,000 shares and commanded one vote in all matters coming before the Board of Directors, the body with primary decision-making authority over all matters substantially affecting the firm. No one owned a greater share of the firm, or had greater voting power, than Lemon. No one had more of a right to run for election to the Management Committee, a panel of five partners whose authority derived from Board delegation. Neither did anyone at the firm have a superior claim on any of the Board's officer roles. In fact, the record shows that Lemon took full advantage of these rights. She served on the Management Committee in 2011. She served as Vice President and Secretary of the firm in 2016. Like all other partners, her annual compensation was tied to the

8

performance of the firm and her contribution to it. In short, Lemon was as fully integrated into MB's management structure as anyone could possibly be.

The district court appropriately concluded that these facts all cut sharply against designating Lemon as an employee. J.A. 495–97. It is not plausible to suggest that such an individual, with rights second-to-none in MB's one and only policy-setting circle, should exercise so little control as to be considered an employee. Analyzing the aforementioned facts through *Clackamas* only makes the conclusion that much more evident. As a full member of the Board with equal voting power, she had as much control over the "rules and regulations" governing the work at MB, and as much ability to "influence the organization" as any other partner. *Clackamas*, 538 U.S. at 449–50 (*Clackamas* factors one and four). She was not salaried or paid a wage, the typical form of remuneration for employees, but rather compensated according to a formula that varied with the "profits [and] losses" of the firm, as befitted a co-owner and employer. *Id.* (*Clackamas* factor six).

Furthermore, Lemon enjoyed a high degree of independence in discharging her duties as partner. She presents no factually-grounded allegation that she reported to or received orders from any individual at the firm.[2] Her work was subject to review by other partners, but only pursuant to a policy that applied equally to all shareholders. The purpose of this review was to assure quality control and provide feedback; reviewing shareholders

---

[2] Lemon claims that she, and everyone else at MB, reported to shareholder Borchers, a partner who sat on the Management Committee during 2016. Lemon is unable, however, to specifically allege any instance in which she, or any other partner, was compelled to report to Borchers or obey orders that he issued solely on his own authority.

9

did not have any authority to mandate that the authoring shareholder make any specific revisions. And finally, no one at the firm possessed unilateral authority to terminate Lemon's employment. She could only be fired by a majority vote of the full Board, of which she was, to repeat, a voting member.

If any doubts remained as to whether or not Lemon was subject to levels of control adequate to classify her as an employee, these facts dispel them. She was not. The organization could "fire the individual," that is, Lemon, but only pursuant to a shareholder vote. *Id.* (*Clackamas* factor one). The organization's "supervis[ion]" of her work was for quality-control purposes only and, ultimately, purely advisory in nature. *Id.* (*Clackamas* factor two). She "reported" to no one, and as a full partner at MB, was not outranked by anyone either. *Id.* (*Clackamas* factor three). It would contradict the image of control and agency that the Supreme Court handed down in *Clackamas* to treat an individual with so much freedom and so little oversight as an employee.

In the face of this evidence, Lemon points to the terms of the employment agreement she signed when she first joined MB as an associate, which subjected her, as an "employee," to the general control of the firm and which the shareholder agreement did not formally supersede. But the force of this argument fades upon consideration that the Board subsequently voted to amend the shareholder agreement, removing every reference to a signatory as an MB "employee." This modification represents a clear, written expression of the intention that associates promoted to partners shed their employee status, not just neutralizing Lemon's argument under *Clackamas* factor five, but actually inverting it. *See id.* (characterizing as relevant "[w]hether the parties intended that the individual be

10

an employee, as expressed in written agreements and contracts"). In the final analysis, then, every *Clackamas* factor militates against counting Lemon among MB's employees.

This result was to be expected. MB's structure is hardly an atypical one for private practice. It is, at its most basic, a bi-level hierarchy. On the first rung are the associates who work under the ultimate direction and supervision of junior or senior partners; on the top, there are the equity partners themselves, who co-own the firm. As co-owners, the equity partners are the ones collectively responsible for setting the firm's rules and standards, and for making the decisions necessary to secure its short- and long-term interests. In this upper echelon, some partners exert greater influence than others. Some form controlling factions. Others, despite their best efforts, are more often in the minority. There may be differences in the apportionment of partnership shares. These are the inescapable realities whenever people assemble in groups or elect to form organizations. But inevitable differences in personal influence do not negate a partner's basic standing in the firm. Nor would sifting through such differences provide any remotely workable standard for determining employer/employee status.[3]

For this court to treat Lemon, an equity partner in a conventionally-structured law firm, as an employee would be to assign ourselves the task of single-handedly refashioning the foundation of a prevailing form of legal practice. *Clackamas* provides no warrant for

---

[3] No two law firms are, of course, exactly the same. Indeed, the structures of contemporary law firms have become increasingly complex, sometimes encompassing relatively new roles such as "senior associate," "non-equity partner," and "of counsel." We do not purport to settle cases arising in these variable contexts, but leave them open for future consideration on their facts under the principles set forth above.

it. Our common law tradition provides no warrant for it. Our sister circuits warn against it. *See, e.g.*, *Solon v. Kaplan*, 398 F.3d 629 (7th Cir. 2005) (declining to treat an equity partner as an employee for purposes of Title VII); *von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139 (8th Cir. 2019) (declining to treat an equity partner as an employee for purposes of the ADEA). In short, Lemon is a partner and equal owner of the firm, not an employee, and she is not within the scope of Title VII's coverage.

III.

Lemon also claimed that MB violated her rights under § 1981 when it denied her request for short-term leave. Section 1981 provides, in relevant part, that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and guards generally against race-based discrimination in the workplace. A *prima facie* case for discriminatory denial of employment benefits consists of four elements: (1) the plaintiff is a member of a protected class; (2) the defendant provided the benefit in question to members of its workforce; (3) plaintiff was eligible to receive the benefit; and (4) defendant's denial of the benefit gives rise to an inference of discrimination. *See Thomas v. Potomac Elect. Power Co.*, 312 F.3d 645, 649–50 (4th Cir. 2002). The parties contest only the third and fourth elements.

To survive the pleadings stage under 12(b)(6), Lemon's allegations respecting these elements must be pled with sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts alleged must, in other words, nudge her claim "across the

12

line from conceivable to plausible." *Twombly*, 550 U.S. at 570. For several reasons, Lemon's claim under § 1981 does not satisfy this standard.

Her allegations respecting the third element, her eligibility, are purely conclusory. Lemon declined to indicate, even in broad outline, the nature of the medical conditions or events that allegedly qualified her for leave, despite being the individual best-positioned to do so. She merely stated that she qualified "through her own health condition" as well as through "two additional qualifying events" experienced by members of her immediate family. J.A. 447. But what these are we do not know. The omission of more specific factual allegations tending to corroborate Lemon's claim of eligibility for leave is especially puzzling given her own, cross-cutting allegation that another Board member openly denied that Lemon was qualified for leave.

Even if Lemon's qualification for leave was assumed, however, she would still have failed to appropriately allege, as required by the Supreme Court's recent holding in *Comcast Corporation v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020), that her race was the but-for cause of the Board's denial of her leave application. *See* 140 S.Ct at 1014–15; *see also Potomac Elect. Power*, 312 F.3d at 649–50. Lemon's allegation that she was subject to a different short-term leave application process than the firm's white partners is by itself insufficient. Because in the absence of plausible allegations that, for example, these white partners were similarly situated, such an allegation indicates only that she was treated differently, not that she was treated differently *because of* her race. *See* J.A. 501.

13

Lemon did present one factually-specific, non-conclusory allegation of racially-motivated conduct, namely that one shareholder complained about her "play[ing] the black card" too often. By Lemon's own accounting, however, this comment was made approximately four months prior to the Board vote denying Lemon short-term leave. As the district court aptly observed, Lemon failed to allege any facts linking these two events, leaving any potential connection a matter for speculation. J.A. 503. Because Lemon's other race-related allegations are conclusory, they cannot be woven together with this one to suggest a "general pattern" from which racial discrimination might be reasonably inferred. *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017). Speculation, of course, falls short of what *Twombly* and *Iqbal* require. *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015). In the end, the district court was left with a sparse set of pleadings, incapable of stating a plausible claim that Lemon's short-term leave request would not have been denied but for her race.

IV.

For all the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED.*

14