**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2054**

———————

MADHUSUDAN KATTI, on behalf of himself and other similarly situated members
of his class,

        Plaintiff – Appellant,

v.

WARWICK A. ARDEN, in his individual and official capacity; MYRON FLOYD,
in his individual and official capacity; STITH "TOM" GOWER, in his individual
and official capacity; JEAN GOODWIN, in her individual capacity; KEN
ZAGACKI, in his individual capacity,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Richard E. Myers, II, Chief District Judge.  (5:23−cv−00233−M−BM)

———————

Argued:  October 24, 2025                                            Decided:  December 2, 2025

———————

Before WILKINSON, RICHARDSON, and HEYTENS, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge
Richardson joined. Judge Heytens wrote an opinion concurring in part and dissenting in
part.

———————

**ARGUED:**  Valerie Bateman, NEW SOUTH LAW FIRM, Carrboro, North Carolina, for
Appellant.  Lindsay Vance Smith, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  Jeff Jackson, Attorney General,

Jeremy D. Lindsley, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

WILKINSON, Circuit Judge:

The first time Madhusudan Katti sought tenure at North Carolina State University (NCSU), his application was denied. The next time—three years later—it was approved. According to Katti, the "only" plausible inference from that experience is that the first tenure decision was an act of discrimination and retaliation. Opening Br. at 17–18.

The district court disagreed, and so do we. Katti's own complaint made clear that there were a host of legitimate reasons for the first tenure decision. To infer foul play from Katti's conclusory allegations would be nothing more than speculation. The result would be to impair academic freedom, which promises the university the ability to "determine for itself on academic grounds who may teach," free from court intervention. *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).

## I.

We begin by recounting the facts. Because this is an appeal from a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we take as true the facts alleged in the complaint. *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 310 (4th Cir. 2025).

## A.

Katti is an Indian man and a professor in NCSU's Leadership in Public Science program. He was first hired to a tenure-track position at NCSU in August 2016. Like all tenure-track professors, he spent the next few years in a probationary period. Tom Gower, Katti's department head, met with Katti annually during the probationary period to review his performance. Ken Zagacki, another faculty member, sometimes joined the meetings.

3

In June 2019, Katti ended his probationary period by applying for tenure. The first decisionmaker to review his application was an Interdisciplinary Retention, Promotion, and Tenure Committee (IRPTC). Twelve faculty members, including Zagacki and Jean Goodwin, sat on the IRPTC. After considering Katti's application, they decided—by a vote of six to five, with Zagacki not voting—not to recommend Katti for tenure.

After the IRPTC came to its decision, Katti's application was passed to the college dean, Myron Floyd, and then to the university provost, Warwick Arden. Among other information, they were provided a letter from Gower expressing his view of Katti's application. Floyd and Arden ultimately came to the same conclusion as the IPRTC. In April 2020, Arden informed Katti that his tenure application was denied.

Undaunted, Katti proceeded to reapply. In April 2023, he was granted tenure.

B.

Katti filed this lawsuit after receiving tenure the second time he applied. In this suit, he sought damages from Arden, Floyd, Goodwin, Gower, and Zagacki, arguing that their conduct the first time he applied was unlawful in several ways. First, he alleged that they racially discriminated against him in violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1981. Second, he alleged that they retaliated against his "non-traditional teaching methods" in violation of the First Amendment. J.A. 132. He brought his claims under the cause of action provided in 42 U.S.C. § 1983.

Katti's amended complaint focused primarily on Goodwin and Gower. With respect to Goodwin, the complaint pointed out that she wrote a memorandum to Gower criticizing Katti's "persistent inability to meet his responsibilities" in a class the two of them co-

4

taught. J.A. 72, 89–90. It also alleged that Goodwin told Katti he was "incapable/incompetent," J.A. 91, omitted his work from a social media post promoting the work of other colleagues, and encouraged the IRPTC to deny him tenure. This behavior, Katti argued, revealed Goodwin's "personal malice" towards him that had "no source other than . . . his race and ethnicity." J.A. 126–27. She should, he continued, have recused herself from the IRPTC under an NCSU policy requiring recusals when necessary to prevent "an actual or [the] appearance of a . . . conflict of interest." J.A. 119–21.

With respect to Gower, the amended complaint alleged that he included false, overblown, or untimely criticisms in his end-of-year performance reviews and in his letter to the tenure decisionmakers. In Katti's 2017 performance review, for example, Gower stated—inaccurately, says Katti—that Katti was so absent that his students in the prestigious Doris Duke Conservation Scholars program transferred to another school. In Katti's 2018 performance review, Gower stated—misleadingly, says Katti—that Katti taught only one class that year and received low student evaluation scores, and that Katti's "loose and reactive" teaching style was causing "friction" with colleagues and students. J.A. 103. And in Gower's letter regarding tenure, he pointed out that students had complained about Katti's "lack of guidance and availability" as a mentor and that the Doris Duke incident caused NCSU to "almost los[e] the program"—another distortion, according to Katti. J.A. 83–84, 95.

Katti's allegations with respect to Zagacki, Floyd, and Arden are more difficult to parse. Zagacki (and Gower), he argued, "enabl[ed]" Goodwin by failing to seek her removal from the IRPTC—a course of action that "can only be explained by" racial animus.

5

J.A. 119. Floyd, he pointed out, also failed to take action even though Katti informed him of Goodwin's "biases." J.A. 108. Arden signed the letter informing Katti of his denial of tenure. And all of them participated in a process that, as the complaint framed things, did not appreciate the true measure of Katti's qualifications. The complaint otherwise failed to allege any relevant facts about the role Zagacki, Floyd, and Arden played in the decision to deny Katti tenure.

The crux of Katti's amended complaint was the allegation that a white professor would have fared better than he did in the same tenure process. While he asserted it numerous times, though, the complaint included just two structured comparisons between himself and white colleagues. The first was a chart at ¶ 209 that showed that five white colleagues, all hired between 2013 and 2017, were granted tenure while Katti was not. The second was a chart at ¶ 213 that showed that a particular white colleague was granted tenure despite publishing fewer articles, delivering fewer conference presentations, and securing fewer grants than Katti. Neither chart stated whether Arden, Floyd, Goodwin, Gower, or Zagacki played a role in the decisions to grant the white professors tenure.

C.

After considering Katti's amended complaint, the district court dismissed it under Rule 12(b)(6) for failing to state a claim. With respect to Katti's race discrimination claims under the Equal Protection Clause and § 1981, the court observed that the complaint contained "conspicuously little regarding race" and concluded that the claims were therefore "speculative." J.A. 160. With respect to Katti's First Amendment retaliation

6

claim, the court held that Katti had neither identified any protected speech nor plausibly alleged that such speech was the cause of his tenure denial. This appeal followed.

## II.

Before we turn to the merits of Katti's claims, we outline the principles governing our review.

## A.

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That means it must plead facts that, when accepted as true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim to relief "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

The standard articulated in *Twombly* and *Iqbal* applies to *each* claim against *each* defendant in a civil action. *Id.* at 676. That is true in every suit, but it bears special emphasis in a § 1983 suit like this one, where "vicarious liability is inapplicable" so the focus is on each defendant's "own individual actions." *Id.* Allegations against a common employer cannot substitute for allegations of "personal involvement" by the individual defendants. *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). Nor can alleged conduct by one individual defendant be attributed to another. *Id.*

In this suit, then, the district court was obligated to dismiss Katti's claims unless it could reasonably infer that Arden, Floyd, Goodwin, Gower, and Zagacki—each, by their own individual actions—violated the Equal Protection Clause, § 1981, and the First

7

Amendment. We review the district court's decision de novo. *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025).

B.

Because this suit concerns a university tenure process, there is an additional set of principles at play—principles that counsel a "restrained" approach. *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).

As we have long recognized, a university's decision to grant or deny tenure is informed by many decisionmakers and by "varied, inevitably subjective factors." *Mayberry v. Dees*, 663 F.2d 502, 519 (4th Cir. 1981). The decisionmakers often include dozens of faculty across multiple committees. The factors they consider include the quality of the professor's "scholarship, . . . pedagogy, [and] . . . service to the university." *Id.* at 514. When all is said and done, a professor might be denied tenure because his research is shallow, because his teaching is ineffective, because his collegial contributions are scant, or for any combination of reasons reflecting the views of the faculty involved.

Courts are not well positioned to second-guess these determinations. Each depends upon an evaluation of "cumulative information" by people who not only know the professor well but have expertise in his particular field. *Ewing*, 474 U.S. at 226 (quoting *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978)). Evaluations do not, moreover, lend themselves easily to quantitative analysis. A single article may make a seminal contribution to a discipline that more numerous articles, while useful, are hard pressed to equal. A comparison of article counts between two professors may fail to elucidate the quality of the insights therein. Determining the size of their respective

8

intellectual imprints, then, calls for the exercise of judgment, not the application of an algorithm. All the more so because a grant of tenure provides the professor "security in continued employment" that can almost never be revoked. *Perry v. Sindermann*, 408 U.S. 593, 599 (1972).

While it is true that tenure decisions can reflect insularity or personal favoritism, the judgment at play remains "scholarly," not legal. *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 557 (4th Cir. 2011) (quoting *Smith v. Univ. of N.C.,* 632 F.2d 316, 345–46 (4th Cir. 1980)). No legal rule can resolve whether a theory about bird population dynamics in urban areas[1] is more innovative than one about the role of chestnut trees in indigenous communities.[2] Courts thus work from a deficit which even expert testimony would be challenged to entirely overcome. That is why "when judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225.

Even if we were well-positioned to review these decisions, doing so would create fissures in the bedrock of higher education: academic freedom. Such freedom "thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy

---

[1] *See* John M. Anderies, Madhusudan Katti & Eyal Shochat, *Living in the City: Resource Availability, Predation, and Bird Population Dynamics in Urban Areas*, 247 J. Theoretical Biology 36 (2007).

[2] *See* S. Kathleen Barnhill-Dilling & Jason A. Delborne, *The Genetically Engineered American Chestnut Tree as Opportunity for Reciprocal Restoration in Haudenosaunee Communities*, 232 Biological Conservation 1 (2019).

itself." *Ewing*, 474 U.S. at 226 n.12 (citations omitted). It was the latter sphere of protection, sometimes described as "university autonomy," that Justice Frankfurter invoked when he spoke of the university's latitude to "determine for itself on academic grounds who may teach." *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring). And it is this latter sphere, no less a "special concern of the First Amendment" than the former, that is at play when we are asked to review claims of tenure discrimination. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

If tenure committees were motivated to grant tenure by fear of court intervention, it would create "an atmosphere of suspicion and distrust" that would contravene in the most direct way this commitment to university autonomy. *Keyishian*, 385 U.S. at 603 (quoting *Sweezy*, 354 U.S. at 250). When such an atmosphere takes hold, "[s]cholarship cannot flourish." *Id.* Fear of litigation could also spark an epidemic of "tenure inflation" echoing the grade inflation that often plagues higher education.

The upshot of these principles is not that there is no role for courts in reviewing claims of tenure discrimination. There is no categorical "university exception" to the civil rights laws. Our role, however, is a limited one. We are "narrowly directed" to consider whether the denial of tenure was due to unlawful animus. *Adams*, 640 F.3d at 557 (quoting *Smith,* 632 F.2d at 345–46). And consistent with our ordinary pleading standards, a professor alleging animus must present "more than suspicion, more than unproven possibilities" before we will subject the tenure process to our scrutiny. *Mayberry*, 663 F.2d at 520. Anything less would convert courts—against all precedent and logic—into "Super-Tenure . . . Review Committees." *Clark v. Whiting*, 607 F.2d 634, 638 (4th Cir. 1979).

10

III.

With these principles in mind, we turn to Katti's claims of race discrimination under the Equal Protection Clause and § 1981. The district court found that neither met accepted pleading standards, and we agree.

A.

The Equal Protection Clause prohibits states from denying persons "the equal protection of the laws." U.S. Const. amend. XIV, § 1. This powerful proscription "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

To plead an equal protection violation, a plaintiff must satisfy a two-part test. First, he must plausibly allege that the defendant treated him differently than someone else "similarly situated" in all relevant respects. *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022). Second, he must plausibly allege that, under the appropriate level of constitutional scrutiny, the difference in treatment is unjustified. *Id.*; *see also Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017).

In the context of university tenure, "similarly situated in all relevant respects" means that the tenure committee has adjudged the plaintiff and his comparator to have a similar quality of "scholarship, . . . pedagogy, [and] . . . service to the university," or similar performance in the other categories they deem essential. *Mayberry*, 663 F.2d at 514. If the two tenure candidates are similar in those ways, but different when it comes to race, then the plaintiff has sufficiently pled the first prong of our equal protection test.

11

Katti's allegations in this case fall well short of that standard. The chart at ¶ 209 of his amended complaint pointed out that Katti did not receive tenure in 2020 while five white professors did between 2013 and 2023. But it contained no information whatsoever about the quality of those professors' work. The chart at ¶ 213 fares slightly better by pointing out that Katti published more articles, delivered more conference presentations, and secured more grants than a white colleague who received tenure. But, as we discussed above, scholarship quantity is an imperfect metric for scholarship quality. While Katti's higher numbers could make a difference if all other things were equal, "things, when teaching qualifications are being examined at the university level, are practically never equal." *Id.* at 511.

In any event, Katti's complaint did not suggest that research productivity was the primary reason he was denied tenure. Instead, Goodwin and Gower's criticisms of Katti—which Katti believes were the driving force behind his denial—focused on his teaching, mentorship, and administrative skills. Goodwin, for example, spoke about Katti's "persistent inability to meet his responsibilities" in a class the two of them co-taught. J.A. 72, 89–90. Gower highlighted Katti's low teaching load, low student evaluation scores, "loose and reactive" teaching style, and "lack of guidance and availability" as a mentor. J.A. 95, 103. Gower also believed that Katti caused NCSU to "almost los[e]" the Doris Duke Conservation Scholars program. J.A. 83–84. By drawing a comparison solely on the basis of research productivity, the chart at ¶ 213 missed the forest for the trees.

Katti's allegations fall short for another reason. Neither the chart at ¶ 209 nor the chart at ¶ 213 stated whether Arden, Floyd, Goodwin, Gower, and Zagacki were even

12

involved in the decisions to grant tenure to the white professors identified as comparators. Without an allegation that *these* defendants were involved, there is no way the district court could have reasonably inferred that they treated Katti and a similarly situated comparator differently. Try as he might, Katti cannot pin the institutional actions of NCSU on the individual defendants in this case.

B.

Section 1981 guarantees "[a]ll persons" the same right "to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. This statutory provision, originally enacted as part of the Civil Rights Act of 1866, "guards generally against race-based discrimination in the workplace." *Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 399 (4th Cir. 2021).

To plead a § 1981 violation, a plaintiff must plausibly allege "both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (quoting *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006)). Intentional discrimination under § 1981 is discrimination that "would not have happened but for the plaintiff's race." *Id.* (citing *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020)).

Each of the bases on which Katti asks us to infer intentional race discrimination is highly speculative. First, Katti asks us to infer intentional race discrimination from the fact that Goodwin and her colleagues criticized him—without, he says, having "any real reason" to do so. Opening Br. at 20. He points to our decision in *Bryant v. Aiken Reg'l*

13

*Med. Ctrs. Inc.*, 333 F.3d 536 (4th Cir. 2003), where we found an inference of employment discrimination reasonable. In that case, however, the employer did "not suggest that [the employee's] work . . . was subpar" but denied the employee a job opportunity anyways. *Id.* at 544. That case is not this case. Goodwin and Gower's persistent criticisms of Katti's teaching and mentorship here provide ample basis for their belief that his work was subpar. If that is not a "real reason" for them to oppose granting him tenure, it is hard to fathom what is.

Katti next asks us to infer intentional race discrimination from the fact that Goodwin did not recuse herself from the IRPTC and that Gower and Zagacki did not compel her to recuse. Opening Br. at 18–19. According to Katti, Goodwin's presence on the committee violated NCSU's conflict-of-interest policy. While a failure to follow standard operating procedures might support an inference of discrimination in another case, *see, e.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 298–99 (4th Cir. 2010), we are not convinced there was any such failure here. A conflict of interest is a "division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Goodwin's belief that Katti was "incapable/incompetent," J.A. 91, was not a conflict of interest when the very task before the IRPTC was to decide whether Katti was capable and competent. In fact, since her belief was the product of her experience co-teaching a class with Katti, it was precisely the kind of informed perspective the IRPTC had every reason to solicit.

Katti also asks us to infer intentional race discrimination from what he alleges is different treatment afforded to him and his white colleagues. Opening Br. at 12–13, 15. It is true that different treatment between a plaintiff and a comparator who is similarly

14

situated in all relevant respects can support an inference of intentional discrimination under § 1981, just as it can support an equal protection claim. *See Lemon*, 985 F.3d at 399–400; *Nadendla*, 24 F.4th at 305–06. But as we explained above, Katti's amended complaint falls well short of alleging a similarly situated comparator.

Ultimately, Katti's theory of race discrimination falters. The facts he alleged about Goodwin and Gower had nothing to do with race, and he alleged almost no facts at all about Arden, Floyd, and Zagacki. That he argues their actions can "only be explained" by race does not make it so. J.A. 119–22, 126–27. By offering speculation rather than facts, Katti pled precisely the kind of "[l]abels, conclusions, recitation of a claim's elements, and naked assertions" that the Rules of Civil Procedure forbid. *Nadendla*, 24 F.4th at 305 (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019)).

In fact, an "obvious alternative explanation" for Katti's denial of tenure emerges from his complaint: the decisionmakers who reviewed his first tenure application believed he was not qualified. *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 588 (4th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682). Katti evidently believes he was qualified, but that by itself suggests nothing about whether *they* did. His conjecture is not enough to push his claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## IV.

We now turn to Katti's First Amendment claim: that he was unlawfully denied tenure in retaliation for his "non-traditional teaching methods." J.A. 132. We agree with the district court that this claim was insubstantial.

15

The First Amendment, as incorporated by the Fourteenth, prevents the states from "abridging the freedom of speech." U.S. Const. amend. I. This proscription safeguards not just "the affirmative right to speak, but also the 'right to be free from retaliation'" on the basis of protected speech. *Adams*, 640 F.3d at 560 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

When a professor at a public university claims he suffered retaliation because of his speech, we first examine whether his speech was protected by the First Amendment at all. *Id.* at 560–61. The answer to that question is "yes" if the professor spoke "upon a matter of public concern," either in his capacity as a private citizen, *id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) and *Connick v. Myers*, 461 U.S. 138, 142 (1983)), or by way of "scholarship and teaching" in his capacity as a professor, *id.* at 563–64 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006)). If the answer is "yes," we ask whether his protected speech caused the university to take an adverse action against him. *Id.* at 560–61; *see also McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998) (asking if the speech was a "substantial factor" in the adverse action). Finally, we use the *Pickering–Connick* balancing test to weigh the professor's interest in speaking against the university's interest in taking the adverse action. *Adams*, 640 F.3d at 560–61.

It is possible that teaching methods, in another case, could fall within the zone of protection afforded by the First Amendment to speech related to "scholarship and teaching." But that is a question we need not now address, because Katti disclaims the scholarship and teaching label altogether:

16

> The [District] Court inferred from Dr. Katti's employment as a university professor that his [First Amendment] complaints were about "the content of his courses" and his "scholarship" which they were not.

Opening Br. at 10. Nor did Katti's amended complaint even make clear what "methods" of teaching, if any, were at issue. It did not identify Katti's methods by name, describe how they work, or articulate an academic justification for them. It did not contrast them with other methods or explain what made Katti's less traditional. It did not even allege that his methods were an intentional component of his teaching. Instead, it simply pointed out that Gower believed Katti's "loose and reactive" presence in the classroom caused "friction" with students and that Katti received low student evaluation scores. J.A. 93–94, 103. The only reasonable inference we can draw from these facts is that Gower was a critic of Katti's teaching *quality*, not his teaching *methods*. And we can draw no inferences at all about Arden, Floyd, Goodwin, or Zagacki, whom Katti did not mention in his First Amendment arguments. Without more, Katti has not identified speech that could form the basis of a First Amendment claim.

## V.

Finally, the defendants argue they are entitled to qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Because Katti has not alleged any plausible claims to relief, we need not consider whether qualified immunity would otherwise bar them.

17

VI.

It is beyond peradventure that each person, regardless of race or ideology, should have a fair shot when he or she applies for a government job. We have vindicated this principle at public universities time and time again, and for good reason. *See, e.g.*, *Hollis v. Morgan State Univ.*, 153 F.4th 369, 381 (4th Cir. 2025) (reversing summary judgment on a professor's discrimination and retaliation claims); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 315 (4th Cir. 2006) (denying qualified immunity to university officials on an instructor's retaliation claims); *Adams*, 640 F.3d at 565 (extending the First Amendment's protections to a professor's writings on "civil rights, campus culture, sex, feminism, abortion, homosexuality, religion, and morality"). But the gravity of the problem a law was designed to address tells us nothing about the merits of a particular plaintiff's claim that it was violated. For that, we rely on the plaintiff to plead a plausible case. Katti did not do so.

In so concluding, we express no position on the merits of Katti's original tenure application. Katti may have been a fine teacher and scholar at the time he first applied for tenure, or he may not have been. We hold only that Arden, Floyd, Goodwin, Gower, and Zagacki, and the non-defendants involved in reviewing Katti's application, were entitled to exercise their discretion in making that determination. All parties involved may now turn their attention from this court to the noble enterprise in which they were heretofore engaged—that of education.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

18

TOBY HEYTENS, Circuit Judge, concurring in part and dissenting in part:

I agree the district court properly dismissed Katti's First Amendment claim and his race discrimination claim against Jean Goodwin. But I would reverse the district court's dismissal of Katti's individual-capacity race discrimination claims against the four other defendants.

My biggest concern with the district court's analysis is its statement that, because "discretionary decisions such as whether to grant tenure necessarily implicate a host of subjective factors," it is "*exceedingly difficult* for a plaintiff" like Katti "to show disparate treatment." JA 160 (quotation marks removed and emphasis added). That was error. There is no "subjective factors" exception to the Equal Protection Clause or 42 U.S.C. § 1981—in the academy or elsewhere. Many employment decisions involve "complex judgments and numerous decisionmakers." *Mawakana v. Board of Trs. of Univ. of the D.C.*, 926 F.3d 859, 865 (D.C. Cir. 2019). And courts (including this one) have shown themselves fully capable of adjudicating employment discrimination claims by professors. See, *e.g.*, *Hollis v. Morgan State Univ.*, 153 F.4th 369, 381–84 (4th Cir. 2025) (reversing a grant of summary judgment against a professor who alleged sex discrimination).

Like any plaintiff who believes they were treated differently than a similarly situated comparator, all Katti needed to do at the motion-to-dismiss stage was "plausibly" allege that he is similar "in all relevant respects" to at least one person who was treated more favorably than him. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (first quote); *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (second quote). Colleagues need not be identical to be valid comparators. See *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019).

19

Nor may a court—at either the motion-to-dismiss or summary judgment stage—simply credit a defendant's factual assertion that a proposed comparator is inappropriate. See *id.* at 225.

In my view, the complaint's allegations about Jason Delborne are sufficient to withstand a motion to dismiss. The complaint alleges that Katti and Delborne had "very similar" professional backgrounds and were hired into the same department overseen by the same leaders (the non-Goodwin defendants) for the same role. JA 124–25.[*] It also alleges that Katti was a strong performer in all areas of the job and that his tenure application was—on at least some metrics—as impressive or more impressive than Delborne's. Finally, the complaint alleges that Delborne is White and Katti is not, and that Delborne received tenure and Katti did not. In my view, those allegations are sufficient to make Delborne a plausible comparator at the motion-to-dismiss stage.

To be sure, the quantity of an employee's work product—the primary metric on which the complaint alleges Katti outperformed Delborne—is not the only thing employers care about, nor is quantity always a good proxy for quality. But detailed factual allegations about two employees' comparative productivity may still "establish a *plausible* basis for believing" the plaintiff and the comparator were "similarly situated." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010) (emphasis added), aff'd, 566 U.S. 30 (2012). And that is all a plaintiff needs to survive a motion to dismiss.

---

[*] Because the four non-Goodwin defendants all lead or oversee the department, it seems plausible to me that they all played a role in both Katti and Delborne's tenure processes.

To see why, imagine a suit brought by a female sales associate who was denied a raise. The complaint alleges that the plaintiff is as good—if not better—at her job than a male colleague who got a raise, and it offers as support the fact that the plaintiff closed 100 deals that year while her male colleague only closed 10. The complaint further alleges that both sales associates worked for the same supervisor, in the same department, and had the same job title. That complaint should survive a motion to dismiss because it has plausibly alleged that the plaintiff and her male colleague were "in all relevant respects alike." *Nordlinger*, 505 U.S. at 10.

Of course, discovery could reveal that the two sales associates were not, in fact, evenly matched. For one thing, the complaint's allegations may not be borne out by the evidence. See generally *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining how the nature of a plaintiff's burden changes depending on the stage of litigation). Or perhaps the complaint left out information that may prove critical to the court at the summary judgment stage, or to the factfinder at trial. Maybe the male colleague made the most lucrative sale in company history. Maybe the plaintiff closed more new deals but struggled to hold onto existing customers. And so on. But a court should not dismiss a complaint for failure to state a claim just because its allegations may not tell the whole story or because the court can identify plausible and lawful alternative explanations for the employer's adverse action. See *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (to survive a motion to dismiss, "a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim").

21

The same is true here. The complaint alleges Katti was a strong performer and an even more productive scholar than a White colleague in the same department who received tenure. True, discovery could reveal that Katti and Delborne were not so alike after all. Perhaps Delborne published fewer articles than Katti, but one was especially influential. Maybe the department needed a chestnut tree scholar (Delborne's field of expertise) more than a bird expert (Katti's). But as with the suit brought by the hypothetical sales associate, those possibilities do not—at the motion-to-dismiss stage—negate the otherwise plausible story told by Katti's complaint. For that reason, I would reverse the district court's dismissal of Katti's individual-capacity race discrimination claims against the non-Goodwin defendants and remand for further proceedings.