Chalk v. Chalk, 2026 NCBC 31.

STATE OF NORTH CAROLINA

CARTERET COUNTY

JAMES W. CHALK; H. LEN GIBBS;
STEPHEN W. CHALK; and CHALK &
GIBBS, INC.,

       Plaintiffs-
       Counterclaim
       Defendants,

BARBARA E. CHALK; KATHERINE
I. CHALK; and KATHERINE M.
GIBBS,

       Nominal Plaintiffs,
    v.

WILLIAM B. CHALK, JR.,

       Defendant-
       Counterclaimant,

MARGARET K. CHALK,

       Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CVS000946-150


**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT
[Public]**[1]

1.    **THIS MATTER** is before the Court on Defendant Willliam B. Chalk, Jr.'s Motion for Summary Judgment (Defendant's Motion), (ECF No. 50), his Motion for Partial Summary Judgment (Defendant's Partial Motion), (ECF No. 51), and Plaintiffs' Motion for Summary Judgment (Plaintiffs' Motion), (ECF No. 54), (collectively, the Motions).

---

[1] The Court's Order and Opinion was provisionally filed under seal on 1 April 2026 to permit counsel for the parties to confer and advise the Court whether they contend any matters referenced herein should be sealed. The parties have not requested that the Court consider sealing any portion of the Order and Opinion. Therefore, the Court now files its Order and Opinion in its original form on the public record.

2.     Chalk & Gibbs, Inc. is a closely-held corporation that has been owned by the Chalk and Gibbs families for several generations. Defendant William B. Chalk Jr. (Buff), a shareholder and director who also worked for the business for nearly forty years, fell out of favor with the remaining shareholders and was discharged from his employment in February 2023. Shortly thereafter, Buff was removed as a director, and the remaining shareholders contend that they purchased his shares.

3.     After Buff questioned the disposition of his shares, Plaintiffs brought this action for declaratory relief. Specifically, they seek a judgment declaring that Buff is no longer an owner, that the individual Plaintiffs purchased Buff's shares, that their purchase complied with all terms of the shareholders' agreement, and that they are now the only owners of the business.

4.     Buff responds that the attempted purchase of his shares was not in compliance with Chalk & Gibbs' shareholders' agreement and that his termination from employment violated federal and state employment laws. He moves for summary judgment with respect to Plaintiffs' claim for declaratory judgment, and he seeks a partial judgment in his favor on his counterclaim for breach of the shareholders' agreement.

5.     Conversely, Plaintiffs move for summary judgment on their declaratory judgment claim and on Buff's counterclaims for employment discrimination, breach of fiduciary duty, and for breach of the shareholders' agreement.

6.     The Court, having considered the Motions, the exhibits submitted in support of and in opposition to the Motions, the related briefing, other relevant

matters of record, and the arguments of counsel at a hearing on the Motions held 7 January 2026, concludes for the reasons stated below that Plaintiffs' Motion shall be **GRANTED in part** and **DENIED in part**, Defendant's Partial Motion shall be **GRANTED in part** and **DENIED in part**, and Defendant's Motion shall be **GRANTED in part** and **DENIED in part**.

> *Manning, Fulton & Skinner, P.A., by Michael T. Medford and Jessica B. Vickers, and Harvell and Collins, P.A., by Wesley A. Collins, for Plaintiffs James W. Chalk, H. Len Gibbs, Stephen W. Chalk, and Chalk & Gibbs, Inc.*
>
> *Harvell and Collins, P.A., by Wesley A. Collins, for Nominal Plaintiffs Barbara E. Chalk, Katherine I. Chalk, and Katherine M. Gibbs.*
>
> *Wheatly, Wheatly, Weeks, Lupton & Massie, PA, by Claud R. Wheatly and Jefferson J. Newton, and Dunn Pittman Skinner Ashton, PLLC, by Raymond E. Dunn, for Defendant William B. Chalk, Jr. and Nominal Defendant Margaret K. Chalk.*

Earp, Judge.

## I.    FACTUAL BACKGROUND

7.    The Court does not make findings of fact on a motion for summary judgment. Instead, the Court summarizes the material facts it considers to be uncontested. *See, e.g., Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 551 (2020).

8.    Chalk & Gibbs was founded by the Chalk and Gibbs families in 1925 as a partnership. (Dep. William Buffkin Chalk Jr. [B. Chalk Dep.] 160:6–11, ECF No. 49.1 (under seal), ECF No. 59.1 (public version).) On 24 January 1980, the Chalk and Gibbs families converted the business to a subchapter S corporation "to engage in the

business of insurance and real estate[.]" (Articles of Incorporation Chalk & Gibbs, Inc. ¶ 3(a), ECF No. 49.3; B. Chalk Dep. 160:14–15.)

9. On 1 February 1980, H.S. Gibbs Jr. and William B. Chalk, Sr. entered into a shareholders' agreement. (1 Feb. 1980 Shareholders' Agreement [1980 Shareholders' Agreement], ECF No. 49.4.) The 1980 Shareholders' Agreement included a mandatory retirement age of seventy-five. (1980 Shareholders' Agreement ¶ 9.)

10. In 1983, Buff, William B. Chalk, Sr.'s son, became an employee of Chalk & Gibbs. (B. Chalk Dep. 13:20–14:1.) Buff later became a 25% owner in Chalk & Gibbs via a bequest from his father and the purchase of some shares from a third party. (Aff. William B. Chalk Jr. [B. Chalk Aff.] ¶ 5, ECF No. 64.28.)

11. By 1 November 2008, Plaintiffs H. Len Gibbs (Len), James W. Chalk, Sr. (James), Stephen W. Chalk, Sr. (Steve), and Buff Chalk (collectively, the Shareholders) each owned 25% of the stock in Chalk & Gibbs. (B. Chalk Dep. 142:19–25; Aff. H. Len Gibbs [Gibbs Aff.] ¶ 5, ECF No. 53.1 (under seal), ECF No. 59.23 (public version).) Because the Shareholders owned equal shares, the bylaws gave them each an equal vote. (Chalk & Gibbs, Inc. By-Laws [By-Laws] Art. II, § 6(b), ECF No. 49.2; Gibbs Aff. ¶ 7.)

12. In 2008, the Shareholders entered into an updated shareholders' agreement that stated in pertinent part:

> 1. <u>Shareholder Ceases To Be an Employee of the Corporation</u>: Upon the death, disability, retirement, discharge, or resignation of any Shareholder, his or her stock may first be purchased by the children of the Shareholder at a price per share determined by the formula set out

in Exhibit "B" hereto or as the family members shall agree. The children of Shareholders are set forth on Exhibit "A" and shall include the spouse of each child.

a. <u>The Child is an Employee of the Corporation:</u> If a child is employed by the Corporation in good standing, the father of the child may gift, or otherwise transfer, shares to that child. Should a child be employed and the father ceases to become an employee of the Corporation, the child may procure the balance of the father's shares upon the terms and conditions set forth herein. Should more than one child wish to purchase the shares of their father, they shall be divided equally among those children.

b. <u>The Child is not an Employee of the Corporation:</u> Should a child not be employed by the Corporation at the time his father ceases to be an employee of the Corporation, the child shall have two years from the father's cessation of employment to become an employee of the Corporation. Any dividends paid during the two-year election period will be paid to the father's estate. If no children of the father elect to be employed within the two-year period, all dividends paid during that period to the estate of the deceased father will be applied to the purchase price determined by the formula set out in Exhibit "B" hereto. However, upon employment, the child may then elect to purchase the shares formerly owned by the father from his estate upon such terms, as the parties to the transfer shall agree. Should there by [sic] multiple children seeking to acquire of their father, they shall be divided equally among the children.

All dividends paid during the two-year election shall be paid to the father whose employment has ceased or his estate.

* * *

2. <u>Shares Not Purchased by Children:</u> To the extent that any child should decline to agree to purchase all or any portion of the pro-rata share offered to him or her, such shares shall be reallocated to the remaining Shareholders of the Corporation on the same terms and conditions, also on a pro-rata basis in relation to their present holdings, unless all of the remaining Shareholders shall agree otherwise.

3. <u>Shares Not Purchased By Other Shareholders:</u> In the event that all or any portion of the stock of a selling Shareholder or of the estate of a decease [sic] Shareholder shall not be purchased by the remaining

Shareholders, such stock shall then be purchased by the Corporation at a price to be determined by the formula set out in Exhibit "B" hereto.

(2008 Shareholders' Agreement ¶¶ 1(a)–(b), 2–3, ECF 49.6.)

13. Under the 2008 Shareholders' Agreement, the term "Children" is defined as "a lineal descendant of the Shareholders named in Exhibit 'A' and shall include the spouse of each such lineal descendant." (2008 Shareholders' Agreement ¶ 9(a).) As set forth in Exhibit A, Buff's lineal descendants include his daughter, Laura C. Testa, and sons, W.B. Chalk, III (Bill), and Allen Chalk. (2008 Shareholders' Agreement, Ex. A.)

14. During his time at Chalk & Gibbs, Buff managed the real estate division, for which he often made decisions unilaterally without consulting the other shareholders. As discussed below, some of those decisions, such as determining criteria for accepting homeowners' association accounts, determining wages for real estate personnel, and managing commissions and fees for the real estate divisions were contrary to the other principals' expectations of how the division should be run and challenged their ability to trust Buff. (B. Chalk Dep. 172:3–173:8; Dep. Henry Len Gibbs. [Gibbs Dep.] 134:13–18, ECF No. 49.5 (under seal), ECF No. 59.2 (public version); Dep. Stephen W. Chalk [S. Chalk Dep.] 133:12–17, ECF No. 49.7 (under seal), ECF No. 59.3 (public version).)

15. In addition to an equal share of the company's profits reported on their K-1 forms, each of the Shareholders who worked for the company received substantially

equal salaries reported on their W-2s.[2] (Gibbs Aff. ¶ 8; Exs. L–S, ECF Nos. 64.12–.19 (under seal), ECF Nos. 73.5–.12 (public versions).) Moreover, the Shareholders who worked for the company were treated differently from non-shareholder employees by: (1) not being subject to performance reviews; (2) not having to report to a supervisor; and (3) not being required to comply with the employee handbook. (B. Chalk Dep. 166:17–22, 167:13–16; Ex. 25, Def.'s Answers, Objs., Resps. Pls.' First Set Interrogs. [Def.'s Resps.] 10, ECF No. 49.25 (under seal), ECF No. 59.13 (public version); Ex. 26, Employee Review Schedule, ECF No. 49.26 (under seal), ECF No. 59.14 (public version); Gibbs Aff. ¶ 17.)

16.     As long ago as 2011, Buff wanted Chalk & Gibbs to hire his son, Bill, as a salaried employee. (Ex. 28, July 2011 E-mails regarding recent Principals Meeting with Buff Chalk 2, ECF No. 49.28.) Bill was already working part-time as Chalk & Gibbs' IT Services Manager while keeping a full-time position with IBM. (Dep. William B. Chalk, III [Bill Dep.] 16:3–8, 28:16–19, ECF No. 49.31 (under seal), ECF No. 59.16 (public version).)

17.     Finally, at a shareholders' meeting on 8 June 2021, the Shareholders voted to make Bill a salaried employee. He was given permission to work a hybrid schedule while he transitioned from his full-time employment at IBM. (Gibbs Dep. 34:16–37:9; Ex. 8, 2021 Principals Meeting Minutes 7, ECF No. 49.8 (under seal), ECF No. 59.4

---

[2] The Court notes that the salaries are not exactly equal. Steve testified that the slight differences in the W-2 salaries can be attributed to "what gets included back into our income, health insurance, reimbursement, and a lot of other things[.]" (S. Chalk Dep. 29:16–18.)

(public version); Ex. 29, 6/21/2022 E-mail announcing Bill Chalk as Agency Employee [Ex. 29] 1, ECF No. 49.29; B. Chalk Dep. 137:22–24.)

18. Following the announcement of Bill as a salaried employee, the company's highest-producing employee (the Lead Producer) emailed Buff expressing concern that the addition of Bill would foreclose the Lead Producer from becoming a shareholder: "[g]uess this puts the final nail in the coffin of me ever buying in at [C]halk and [G]ibbs[.]" (Ex. 29 at 1.) Buff responded that he supported the Lead Producer "buying in at Chalk & Gibbs[,]" but he did not offer or identify any shares for sale. (Ex. 29 at 1.)

19. In January 2022, Buff announced his intention to transfer 5% of his shares in Chalk & Gibbs to Bill. (Ex. 30, Jan. 2022 E-mails regarding matters related to Buff Chalk's Stock [Ex. 30], ECF No. 49.30; Gibbs Dep. 51:6–12; S. Chalk Dep. 80:15–81:1; B. Chalk Dep. 34:9–14.) On 18 January 2022, Buff hand-delivered to James, President of Chalk & Gibbs, a proposed stock certificate for the transfer. (Ex. 30.) The same day, James wrote Buff via email, "I have your certificate on my desk. We will get the transfer done." (Ex. 30 at 1.) Despite this promise, nothing else happened, and Buff contends that the transfer was purposefully blocked by the other shareholders. (S. Chalk Dep. 80:20–81:9.)

20. Meanwhile, over time, the relationship between Buff and the other shareholders began to sour. Friction also developed between Buff and non-shareholder employees of the company including Stephen W. Chalk, Jr. (Stephen)

(son of Steve Chalk and one of the top producers in the insurance part of the business), Win Chalk (Win) (son of James Chalk), and the Lead Producer. (Gibbs Aff. ¶ 15.)

21. In December 2011, Buff's request to take an advance against future dividends was denied. Plaintiffs allege that, following this denial, Buff started using Chalk & Gibbs' petty cash as a floating line of credit, taking at least $9,500. (B. Chalk Dep. 163:12–164:14; Ex. 10, Mar. 2013 E-mails regarding Principals' Compensation, ECF No. 49.10; Gibbs Aff. ¶ 16b.)

22. In 2017 or 2018, Buff failed to consult with the other principals before contributing a $18,000 real estate commission to a charitable organization. (B. Chalk Dep. 125:24–126:20; Gibbs Aff. ¶ 16d.) Buff also made a unilateral decision to waive a $10,000 management fee earned by the real estate division in order to resolve disputes about alleged mistakes by the division. (B. Chalk Dep. 135:7–11; Gibbs Aff. ¶ 16e.)

23. Employees in the real estate division began to grow frustrated with Buff. He allegedly rejected proposals from employees in that division that would have grown the business over time because it would have decreased his individual earnings in the short run. (Aff. James W. Chalk, Jr. ¶¶ 12–13, ECF No. 53.5; Aff. Stephen W. Chalk, Jr. [Stephen Aff.] ¶¶ 13–14, ECF No. 53.3.) Buff also refused employees' requests for salary increases. (Stephen Aff. ¶ 15.)

24. In January 2022, seven months after Bill was allowed to become a salaried employee and while Bill was still employed full-time with his long-time employer, Buff announced in an email to all company staff, without discussion with the other

shareholders, that Bill Chalk was now a principal at the company. Buff sent this email without Bill having been elected a director by a majority vote of the Shareholders. (Gibbs Aff. ¶ 16c.)

25.     On 31 March 2022, the Shareholders exchanged emails in which Len stated that he thought that the 60/40 commission split with the Lead Producer was too generous. (Ex. 13, Mar. & Apr. 2022 E-mails between Principals regarding Commissions 1, ECF No. 49.13 (under seal), ECF No. 59.6 (public version).) Buff was insistent that commissions should be reduced. (B. Chalk Dep. 186:3–23.)

26.     On 20 April 2022, the Shareholders held a meeting and voted 3 to 1 to reduce renewal commissions for both the Lead Producer and Stephen. (Ex. 12, 2022 Principals Meeting Minutes [2022 Meeting Minutes] 6, ECF No. 49.12 (under seal), ECF No. 59.5 (public version).) A few days later, Buff and the Lead Producer got into a heated dispute regarding the Lead Producer's decision not to bring to Buff's house two UNC football players who were in town to solicit sponsors under the NCAA's new NIL rules. (B. Chalk Dep. 202:13–203:23; Dep. Stephen W. Chalk, Jr. [Stephen Dep.] 58:2–16, ECF No. 49.33 (under seal), ECF No. 59.17 (public version).) According to Stephen, during the confrontation Buff stated that he did not trust the Lead Producer or Stephen. (Stephen Dep. 58:17–20.)

27.     On 25 April 2022, Stephen and the Lead Producer met privately with Steve and threatened to leave Chalk & Gibbs and to take both business and employees with them if their renewal commissions were reduced. (S. Chalk Dep. 89:13–90:2.)

28. The next day Steve met with James, Len, Stephen, and the Lead Producer, intentionally excluding Buff as he was "a sore subject." (Ex. 32, 04/26/2022 E-mail regarding meeting between certain Principals and Agency employees [04/26/2022 Email], ECF No. 49.32; S. Chalk Dep. 91:12–25, 96:1–9.) Without Buff's input, the group discussed rescinding the decision to reduce commissions because "the money [they] would save by reducing [the] commissions would not be worth the potential disruption within the agency." (Ex. 19, 04/27–28/2022 E-mails between Principals regarding Commissions [04/27–28/2022 Emails] 1, ECF No. 49.19 (under seal), ECF No. 59.11 (public version).) It is not apparent from the record that a formal vote to rescind the decision regarding commissions ever took place. (S. Chalk Dep. 94:2–4, 95:3–5.)

29. The individual Plaintiffs also agreed to seek legal counsel to advise them on the procedure for removing Buff from Chalk & Gibbs. (Gibbs Aff. ¶ 19.) Counsel was contacted on 25 April 2022, and the individual Plaintiffs met in person with an attorney on 5 May 2022. (Gibbs Aff. ¶ 19; Gibbs Dep. 127:12–17; Ex. 35, 05/05/2022 Appointment Detail for Meeting with Attorney Wes Collins, ECF No. 49.35.)

30. Also in early May, a Chalk & Gibbs employee reported to her manager that the Lead Producer had sexually harassed her. (B. Chalk Dep. 109:14–110:12.) On 18 May 2022, a meeting of the Shareholders, as well as Stephen, Bill, Chelsea Miller (Len's daughter), and Win took place to discuss the sexual harassment claim. (Ex. 14, May 2022 E-mails regarding Employee Complaint [May 2022 Emails], ECF No. 49.14 (under seal), ECF No. 59.7 (public version); Bill Dep. 155:2–15.) At the meeting,

Buff and Bill advocated for the Lead Producer's discharge. (Bill Dep. 155:16–24.) However, the Shareholders decided not to take action until the issue was reviewed with Chalk & Gibbs' employment practices liability insurance carrier. (Bill Dep. 156:11–18.)

31. Separately, Buff decided to speak to another attorney on his own about the situation. On 17 May 2022, he consulted with counsel regarding the alleged sexual harassment complaint. Afterwards, Buff reported to the Shareholders that they "ha[d] no option but to take immediate action and terminate [the Lead Producer]." (May 2022 Emails 3.)

32. On 18 May 2022, the Shareholders again conferred with the company's counsel, and Buff again advocated for the Lead Producer's discharge. A confrontation ensued between Buff and Steve during which Steve stated that he "could not wait" to get rid of Buff. (B. Chalk Dep. 210:7–19; S. Chalk Dep. 106:13–107:6.)

33. On 8 June 2022, the Lead Producer was disciplined. Rather than being discharged, the Lead Producer was required to take workplace sensitivity training, commit to strictly abide by the company's Harassment Policy, and receive a 5% reduction in commissions for six months. (Ex. 50, Disciplinary Action Documentation, ECF No. 49.50 (under seal), ECF No. 59.21 (public version).)

34. From this point on, Buff contends that the individual Plaintiffs shut him out of participating in management and business decisions. Only three shareholders' meetings took place during the rest of 2022. (2022 Meeting Minutes 7–9.) The individual Plaintiffs admit that fewer meetings than normal took place because of the

tension that had developed between them and Buff.  (Gibbs Aff. ¶ 23; S. Chalk Dep. 118:19–22.)

35.     In late January 2023, Buff received a letter from Plaintiffs' counsel informing him that he was subject to mandatory retirement because he had reached age seventy-five.  The letter stated that Buff's last day as an employee of Chalk & Gibbs, Inc. would be 3 February 2023.  (Ex. 38, 01/23/2023 Letter from Andrew Foster to Buff Chalk regarding Buff Chalk's Removal from Agency 1, ECF No. 49.38 (under seal), ECF No. 59.19 (public version).)  The letter also advised Buff that the individual Plaintiffs offered to buy his 25% interest (16,375 shares) in the company for one million one hundred thousand dollars ($1,100,000.00), payable in twenty (20) quarterly installments bearing interest at three percent (3%) per annum.  (Removal Letter 1.)  Buff did not accept the offer.  (B. Chalk Aff. ¶ 14.)

36.     When discussions did not produce an agreement for an amicable separation, the individual Plaintiffs held a special meeting of the directors on 3 February 2023, at which they unanimously adopted resolutions to remove Buff as Treasurer of Chalk & Gibbs and terminate his employment.  (Ex. 39, 02/03/2023 Minutes of Special Meeting of Directors 2–3, ECF No. 49.39.)  In a special shareholders' meeting held the following week, the individual Plaintiffs unanimously voted to remove Buff as a director of Chalk & Gibbs.  (Ex. 40, 02/10/2023 Minutes of Special Meeting of Shareholders 2, ECF No. 40.40.)  Buff received notice of both meetings but chose not to attend.  (Ex. 41, Notices of Special Shareholders and Directors Meetings, ECF No. 49.41; Gibbs Aff. ¶ 22; B. Chalk Dep. 105:5–9.)

37. After his removal, the company's counsel informed Buff that he could either (a) gift or transfer his shares to his son Bill, who was still employed by the company; or (b) sell his shares to the individual Plaintiffs. (Ex. 52, Mar. 2023 Correspondence between Counsel for Parties regarding Buff Chalk's Stock Shares 1–2, ECF No. 49.52.) However, Bill was discharged from employment at Chalk & Gibbs on 25 April 2023, prior to receiving a stock certificate documenting the gift or transfer of any of Buff's shares. (Gibbs Aff. ¶ 36; B. Chalk Dep. 34:24–35:12.)

38. On 9 June 2023, the individual Plaintiffs voted in favor of a resolution authorizing their purchase of Buff's 16,375 shares for $1,238,253.97 paid in twenty equal quarterly payments at an interest rate of 6% per annum. (Ex. 43, Resolutions of 9 June 2023 [9 June Resolutions] 6–7, ECF No. 49.43.) They signed a promissory note for the same amount. (Ex. 45, 06/09/2023 Purchase Money Promissory Note [Promissory Note], ECF No. 49.45.)

39. As far as Buff's intended transfer of shares to his son, Bill, the individual Plaintiffs determined that Bill had been employed at Chalk & Gibbs at the time of Buff's discharge but had since been discharged himself, prior to any transfer of Buff's shares, thereby foreclosing Bill's ability to receive shares from Buff. (9 June Resolutions 4–5.) Further, they resolved "that it [was] not in the best interest of the corporation to offer employment to Buff's Children now, in the next two (2) years, or anytime in the future." (9 June Resolutions 5.) Laura C. Roach, Allen Chalk, and Bill were specifically named as Buff's three children. (9 June Resolutions 5.)

40. The Shareholders' Agreement sets the purchase price for shares as follows:

> 5. <u>Purchase Price and Manner of Payment</u>: The purchase price for any purchase set forth herein shall be as determined by the formula set forth in Exhibit "B." Unless otherwise agreed by all Shareholders, the purchase price shall be paid in full or may be paid in 20 equal, quarterly payments, which shall bear interest at the rate of 6% per annum. Total or partial prepayments shall be made without penalty.

(2008 Shareholders' Agreement ¶ 5.) The formula in Exhibit B is: "2x gross insurance commissions plus 1 x all other revenues. Less: all expenses exclusive of shareholders salaries and life insurance proceeds." (2008 Shareholders' Agreement, Ex. B.) Plaintiffs' expert testified that a purchase price of $1,238,253.97 was determined using the formula in Exhibit B. (Second Aff. Robert Bittner [Bittner Aff.] ¶ 5, ECF No. 65.1.)

41. Buff disagrees with the price calculated by Plaintiffs' expert and testified that the correct value of his shares as of 31 December 2022 was approximately $1,305,742.50, and that the value had increased to as much as $1,681,548.70 by 31 December 2024. (B. Chalk Aff. ¶¶ 7, 16.) Buff also contends that by resolving not to allow his children to become employees, the individual Plaintiffs breached the two-year period specified in Section 1(b) of the 2008 Shareholders' Agreement. (B. Chalk Aff. ¶ 11.)

42. In addition, Buff claims that he has not received money that he is owed. The 2008 Shareholders' Agreement provides that "[d]ividend payments or any other distribution other than salaries shall be allocated in proportion to share ownership." (2008 Shareholders' Agreement ¶ 4.) From 3 February 2023 to 9 June 2023, Chalk & Gibbs paid Buff some dividends, but Buff contends that his 2023 K-1 reported $1,108.80 more than he was actually paid. (B. Chalk Aff. ¶ 12.) Buff also complains

that he has received no other distributions even though, according to him, the other shareholders have. (B. Chalk Aff. ¶ 13.) Further, Buff has not been paid for his shares in Chalk & Gibbs and continues to assert that he owns 25% of the company. (B. Chalk Aff. ¶ 14.)

## II. PROCEDURAL BACKGROUND

43. On 20 October 2023, Plaintiffs initiated this action. (*See* Compl., ECF No. 3.) Plaintiffs filed an Amended Complaint on 23 January 2024 in which they requested a judgment declaring that: (1) all terms of the 2008 Shareholders' Agreement for the purchase of all shares held by Buff were complied with on 9 June 2023; (2) as of 9 June 2023 Buff holds no shares in Chalk & Gibbs and all shares were purchased by James, Len, and Steve; and (3) as of 9 June 2023 the only shareholders in Chalk & Gibbs have been and are James, Len, and Steve. (Am. Compl., ECF No. 8.)

44. On 24 June 2024, Buff filed an Answer in which he asserted counterclaims for (1) discrimination in violation of the Age Discrimination in Employment Act (ADEA); (2) retaliation in violation of Title VII; (3) breach of fiduciary duty; (4) breach of shareholders' agreement; and (5) wrongful discharge in violation of public policy. (*See generally* Defenses, Answer, Mots., & Countercls. [Countercls.], ECF No. 16.) Plaintiffs responded to the counterclaims on 23 August 2024. (ECF No. 23.)

45. Following discovery, Buff filed a Motion for Summary Judgment with respect to Plaintiffs' claim for declaratory judgment and a Partial Motion for Summary Judgment on his own counterclaim for breach of the 2008 Shareholders'

Agreement. (ECF Nos. 50–51.) In addition, Plaintiffs filed a Motion for Summary Judgment with respect to their claim for declaratory judgment and addressing all of Defendant's counterclaims against them. (ECF No. 54.)

46. After full briefing, the Court held a hearing on the Motions on 7 January 2026. All parties were present and heard. (*See* Not. of Hr'g, ECF No. 87.)

47. The Motions are now ripe for disposition.

### III.   LEGAL STANDARD

48. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).

49. Genuine issues of material fact are those "which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citations and internal quotation marks omitted).

50. In reviewing a motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party. *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022) (citation omitted). Parties moving for summary judgment have the burden of establishing the lack of any triable issue of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985) (citations omitted).

51.     A movant may satisfy its burden by showing that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Should the movant satisfy its burden, "then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e) (emphasis omitted)).

52.     Affirmative summary judgment on a party's own claim for relief carries an even greater burden. *Brooks v. Mt. Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985).

53.     When ruling on a motion for summary judgment, the Court does not resolve issues of fact and must deny the motion if there is any genuine issue of material fact. *Singleton v. Stewart*, 280 N.C. 460, 464 (1972) (citations omitted).

## IV.     ANALYSIS

54.     Plaintiffs move defensively for summary judgment on all of Buff's counterclaims, as well as affirmatively on their own claim for declaratory judgment. (*See* ECF No. 54.) Buff moves defensively for summary judgment on Plaintiffs' claim for declaratory judgment, as well as affirmatively on his counterclaim for breach of

the 2008 Shareholders' Agreement. (*See* ECF Nos. 50–51.) The Court analyzes the Motions claim by claim, beginning with the counterclaims.

## A. Employment Discrimination Claims

55. Plaintiffs argue that Buff's counterclaims for age discrimination pursuant to the ADEA, 29 U.S.C. § 621 *et seq.*, and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* (Title VII), fail because those federal statutes do not protect Buff given his status as both an owner and director of Chalk & Gibbs. They further contend that Buff's state law claim for wrongful discharge in violation of public policy pursuant to section 143-422.2 of the North Carolina General Statutes fails for the same reason. (Br. Supp. Mot. Summ. J. Pls./Countercl. Defs. [Pls.' Br. Supp.] 11–13, ECF No. 55.) Buff responds that he worked for the company as an employee and therefore was protected under these laws. (Def.-Counterclaimant's Resp. Br. Pls.-Counterdefendants' Mot. Summ. J. [Def.'s Resp. Br.] 14, ECF No. 67.)

56. Both sides agree that *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003), applies to determine whether Buff is entitled to the protections afforded an employee. But Buff also argues that the principles undergirding *Meiselman v. Meiselman*, 309 N.C. 279 (1983), specifically his alleged loss of control, entitle him to protection under the anti-discrimination laws. Buff argues that he lost the ability to exercise control over the company in spring 2022, when the other shareholders allegedly froze him out of decision-making. As a result, Buff contends

that his status was reduced to that of an employee, rather than an owner. (Def.'s Resp. Br. 4–13.)

57. Buff maintains that, in North Carolina, whether a minority shareholder in a closely-held corporation is protected by state and federal employment discrimination laws has not been definitively decided. (Def.'s Resp. Br. 2.) He argues that the Court should apply the *Clackamas* factors differently in a case, like this one, where a minority shareholder's reasonable expectations of continued employment and participation in decision-making have been denied him. (Def.'s Resp. Br. 3–6.)

58. Title VII and the ADEA prohibit adverse employment action based on retaliation (for opposing sex discrimination) and age discrimination, respectively. 42 U.S.C. § 2000e-3 (retaliation); 29 U.S.C. § 623(a)(2) (age). However, both statutes apply only when the claimant is an employee. *Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 396 (4th Cir. 2021). Under both statutes, "employee" is defined merely as "an individual employed by an employer[.]" 29 U.S.C. § 630(f); 42 U.S.C. § 2000e(f).

59. Likewise, North Carolina recognizes a cause of action for wrongful discharge based on age or in retaliation for opposing sex discrimination. The cause of action derives from a state statute, the North Carolina Equal Employment Practices Act (NCEEPA), which declares such discrimination to be against public policy. *See, e.g.*, *Walker v. Town of Stoneville*, 211 N.C. App. 24, 36 (2011) (citing N.C.G.S. § 143-422.22 in an age discrimination case).

60. The NCEEPA is "based on Title VII . . . , and North Carolina Courts look to federal Title VII jurisprudence for guidance on its interpretation." *Edwards v. Strata*

*Solar, LLC*, 925 S.E.2d 302, 306 (2025) (citing *N.C. Dep't of Corr. v. Gibson*, 308 N.C. 131, 136 (1983)); *see also Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 875 (2003) ("When considering a wrongful-discharge claim on the basis of age under North Carolina law, this Court has previously held that it 'should apply the same standards that apply under the ADEA.'" (quoting *Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 546 (M.D.N.C. 2002))).

61.     As the Supreme Court has observed, the definition of employee under both Title VII and the ADEA does little to advance the analysis because it is "completely circular." *Clackamas*, 538 U.S. at 444 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)).  Instead, courts must analyze an individual's employment status by reference to "the conventional master-servant relationship as understood by common-law agency doctrine." *Id.* at 445 (citation omitted).  The touchstone of this analysis is the common-law element of control. *Id.* at 448.

62.     The amount of control exerted by an individual is gauged by analyzing the following non-exhaustive factors:

> [1] Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work. [2] Whether and, if so, to what extent the organization supervises the individual's work. [3] Whether the individual reports to someone higher in the organization. [4] Whether and, if so, to what extent the individual is able to influence the organization. [5] Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts. [6] Whether the individual shares in the profits, losses, and liabilities of the organization.

*Id.* at 449–50 (citation modified); *see also Lemon*, 985 F.3d at 396–99 (applying the *Clackamas* factors in a Title VII case); *Tikhonova v. Se. Gymnastics*, No. 3:24-CV-

00280-FDW-SCR, 2024 U.S. Dist. LEXIS 159970, at *11–15 (W.D.N.C. Sep. 5, 2024) (analyzing the *Clackamas* factors in an age discrimination case).

63.     The Court uses the *Clackamas* factors to determine whether Buff meets the definition of an employee under the ADEA, Title VII, and N.C.G.S. § 143-422.2.  When analyzing these factors, the Court looks at Buff's status at Chalk & Gibbs throughout his tenure rather than limiting its review to his status at the time of his termination. *See, e.g., Solon v. Kaplan*, 398 F.3d 629, 633–34 (7th Cir. 2005) (analyzing whether the individual was an employee by looking at the individual's tenure at the company); *Schmidt v. Ottawa Med. Ctr., P.C.*, 322 F.3d 461, 467 (7th Cir. 2003) (same).

64.     The *Lemon* case is particularly instructive.  As was true there, on the first four factors, Buff "could only be fired by a majority vote of the full [b]oard, of which []he was . . . a voting member." *Lemon*, 985 F.3d at 398; *see* By-Laws Art. III, § 7(b) (requiring majority vote of quorum of board to act), Art. IV, § 3 (authorizing board to remove officers), Art. III, § 10 (authorizing director removal with or without cause by shareholders or with cause by board).  He was a principal at the company, which "recognized no higher rank or responsibility[,]" *Lemon*, 985 F.3d at 397–98, and he reported to no one, (B. Chalk Dep. 166:22–167:24, 172:4–24).  He owned the same number of shares and commanded the same vote in all matters coming before the directors. *Lemon*, 985 F.3d at 397.  "No one owned a greater share of the firm, or had greater voting power, than" Buff. *Id.*  As a director, he sat on the decision-making body that controlled the company.  Furthermore, he "enjoyed a high degree of independence in discharging h[is] duties" as a principal, including his control over

the real estate business. *Id.*; B. Chalk Dep. 167:13–14 ("[F]or the other 39 years, I would say that we didn't supervise each other."); Def.'s Resps. 10 ("I do not recall instances when my work product for the Agency was reviewed by an owner or employee of the Agency with supervisory authority.").

65. All this shows that Buff "was as fully integrated into [Chalk & Gibb]'s management structure as anyone could possibly be." *Lemon*, 985 F.3d at 397. As a result, "[i]t is not plausible to suggest that such an individual, with rights second-to-none in [Chalk & Gibbs]'s one and only policy-setting circle, should exercise so little control as to be considered an employee." *Id.* The fact that other principals sometimes out-voted him does not change the analysis. *Id.* at 398 ("There may be differences in the apportionment of partnership shares. . . . But inevitable differences in personal influence do not negate a partner's basic standing in the firm.").

66. On the fifth and sixth factors, Buff testified that he received compensation and dividends equal to the other shareholders, at least until 9 June 2023, when he stopped receiving dividends altogether. (B. Chalk Dep. 143:4–18.) To be sure, the 2008 Shareholders' Agreement referred to the principals as employees, and Buff, like the other shareholders, received a salary in the form of W-2 wages, (Ex. O, Buff Chalk W2, ECF No. 64.15 (under seal), ECF No. 73.8 (public version); Dep. of Joy White Bell [Bell Dep.] 37:16–20, ECF No. 64.24 (under seal); ECF No. 73.16 (public version).) But these facts alone do not transform Buff into an employee under the anti-discrimination laws. *Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 956 (7th Cir. 2014) (noting contract's use of term employee and plaintiff's receipt of

payments through a W-2 "cannot overcome the reality of [plaintiff's] position in the professional corporation"); *Clackamas*, 538 U.S. at 450 ("[T]he mere existence of a document styled 'employment agreement' [does not] lead inexorably to the conclusion that either party is an employee."). The Court therefore concludes that these facts are insufficient to sway the analysis.[3]

67.    Moreover, the fact that Chalk & Gibbs is a closely-held corporation also does not change the result. The *Clackamas* factors still apply. *See, e.g., Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 767 (3d Cir. 2013) (finding that the *Clackamas* factors are "not limited to professional corporations" and applying them to a closely-held family business); *De Jesus v. LTT Card Servs., Inc.*, 474 F.3d 16, 24 (1st Cir. 2007) (holding that the *Clackamas* test "applies to close corporations as well as to professional corporations").[4]

---

[3] Plaintiffs rely on *Bluestein*, in which Bluestein, a shareholder, sued for discrimination in violation of the Americans with Disabilities Act, the Rehabilitation Act of 1973, and Title VII. *Id.* at 948. The Seventh Circuit determined that because hiring and firing decisions were made by the board, the plaintiff was a board member, and the plaintiff participated in her own termination vote, she stood in the position of an employer, rather than an employee. *Id.* at 953.

Buff argues that Plaintiffs' reliance on *Bluestein* is misplaced because here, the individual Plaintiffs met in secret and discussed removing him without his input. (Def.'s Resp. Br. 15–16.) However, the record evidence is that Buff was given notice of both the shareholders and the board of directors' meetings in which his removal as an employee and director were formally considered, had the right to vote on each decision, and declined to attend the meetings. *See, e.g., Solon*, 398 F.3d at 633 (finding plaintiff was not entitled to protection as an employee when he received an equal vote with the other three general partners and a two-thirds vote was required for the termination of a general partner); *Steffen v. St. Paul Eye Clinic, P.A.*, 652 F. Supp. 3d 1029, 1037 (D. Minn. 2023) (finding the plaintiff was not entitled to protection as an employee when he had the right to vote on the decision and a vote of 80% or more of the board was required for his termination).

[4] Defendant also argues that our Supreme Court's decision in *Meiselman* should guide the Court's *Clackamas* analysis regarding its application to his claim for wrongful discharge,

68.     In sum, applying the *Clackamas* factors, Buff is not entitled to the protection of the employment laws he cites given the amount of control he had over the business.  Buff held an equal vote with his shareholder counterparts, he was not obligated to follow the same rules and regulations as non-shareholder employees, he did not have to report to anyone higher in the organization in order to make many decisions, he was not supervised by anyone, and he received an equal portion of the company's profits during the period of time that Plaintiffs agree he was a shareholder.  Because Buff cannot seek the protection of the ADEA, Title VII, or the NCEEPA, those counterclaims fail as a matter of law.

69.     Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED** on Defendant's counterclaims for age discrimination in violation of the ADEA; retaliation in violation of Title VII; and wrongful discharge in violation of the NCEEPA.

**B.      Breach of Fiduciary Duty**

70.     Buff contends that, as a minority shareholder, the remaining three shareholders, who collectively held a majority interest, owed him fiduciary duties. (Def.'s Resp. Br. 21–22.)  Buff maintains that the collective majority breached those fiduciary duties by, among other ways, (1) attempting to force him to sell his stock at a significantly lower value; (2) forcing the sale of his stock earlier than the timeframe

---

even though he did not allege a *Meiselman* claim but reserved the right to amend his counterclaims to add one later.  (Countercls. ¶ 174.)  As discussed below, the Court does not find that the Plaintiffs acted as a control group to benefit themselves rather than the company.  In addition, *Meiselman* involved a claim for dissolution, and no such claim has been asserted here.  Thus, the Court declines to apply the teachings of *Meiselman* here.

set out in the 2008 Shareholders' Agreement; (3) refusing to transfer 5% of Buff's stock to Bill; (4) blocking Buff's children from becoming shareholders; (5) diverting dividends from Buff by increasing their own salaries; (6) acting in bad faith by failing to pay him dividends; and (7) refusing to produce financial records. (Def.'s Resp. Br. 24; Countercls. ¶ 152.)

71. Plaintiffs respond that Buff's counterclaim for breach of fiduciary duty fails because no fiduciary duties existed, and even if they did exist, they were not breached. Plaintiffs contend that the fact that a group of shareholders—each holding a minority interest—collectively outvote another minority shareholder is simply a matter of corporate governance and does not equate to minority oppression. (Pls.' Reply Br. Supp. Mot. Summ. J. [Pls.' Reply] 10, ECF No. 78.) They argue that Buff's characterization of the other three shareholders as the "Controlling Shareholders" is misplaced. (Pls.' Reply 10–11.)

72. To state a claim for breach of fiduciary duty, "a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Chisum v. Campagna*, 376 N.C. 680, 724 (2021) (quoting *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019)). A fiduciary relationship exists when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599 (2018) (quoting *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014)).

73. Shareholders in a corporation generally do not owe a fiduciary duty to one another. *See Freese v. Smith*, 110 N.C. App. 28, 37 (1993) (citation omitted); *Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *9 (N.C. Super. Ct. July 26, 2018). This is because, in most situations, one shareholder does not repose a "special confidence" in the others, but instead has his own rights, including the right to vote, afforded by the shareholders' agreement. Indeed, allowing a minority shareholder to sue for breach of fiduciary duty each time he or she was outvoted would "negat[e] any and every corporate action taken by a majority." *Duffy v. Schussler*, 287 N.C. App. 46, 64 (2022).

74. However, in rare cases when the circumstances warrant it, "North Carolina courts ha[ve] recognized that individual minority shareholders of a closely-held corporation who act in concert and collectively own the majority interest in the corporation may owe fiduciary duties as the controlling shareholders." *Zagaroli v. Neill*, 2018 NCBC LEXIS 25, at *26 (N.C. Super. Ct. Mar. 28, 2018) (citing *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407 (2000)). Buff contends that the Court should recognize a fiduciary duty here because the three remaining shareholders in this closely-held corporation, each holding a minority interest, banded together in spring 2022 to exclude him from having a say in the management of the business.

75. Because the Supreme Court has not spoken definitively on the question, "[t]he circumstances under which multiple minority shareholders combine into majority or controlling shareholders for the purposes of this *de facto* fiduciary duty

rule is something of an open question in North Carolina." *Duffy*, 287 N.C. App. at 61 (citing *Corwin v. Brit. Am. Tobacco PLC,* 371 N.C. 605, 616 (2018) ("This Court has never held that a *minority* stockholder owes fiduciary duties to other stockholders, but it has also never held that a minority stockholder *cannot* owe fiduciary duties to other stockholders.")).[5]

76.     In general, however, our courts have "refused to impose a fiduciary duty on *minority* members that exercise their voting rights by joining together to outvote a third member." *Duffy*, 287 N.C. App. at 63 (quoting *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *20 (N.C. Super. Ct. June 19, 2019) (collecting cases)). Given this default position, the standard for exception should be exacting and its occurrence rare. A majority coalition should not give rise to a fiduciary duty except in cases that exhibit unusual indicia of shared interests and collective action. Our Court of Appeals framed "[t]he determinative issue" as one where the facts show that the majority vote of the minority shareholders in a closely-held corporation is elevated "into a situation of '*domination and influence*' over the outvoted minority shareholder." *Id.* at 61 (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)). The mere fact that the relevant vote was "of great importance to the complaining minority" is not enough. *Id.* at 64 (citing *Dalton*, 353 N.C. at 651).

---

[5] In *Corwin,* the Supreme Court expressly reserved judgment as to whether a single controlling minority shareholder could owe a fiduciary duty to other shareholders. *Id.* at 616. The Court reasoned that it was unnecessary to decide whether North Carolina should adopt such a rule because the plaintiff had not adequately alleged actual control. *See id.* at 616, 619.

77.     In *Loy v. Lorm Corp.*, 52 N.C. App. 428 (1981), the Court of Appeals held that a minority shareholder could bring a claim against "three fellow shareholders who together held a majority interest, served as corporate 'directors and officers[,]' were 'firmly in control' of the corporation, and had common interests stemming from their related, jointly owned business." *Duffy*, 287 N.C. App. at 63 (quoting *Loy*, 287 N.C. App. at 431). But the Court of Appeals cabined *Loy*'s holding in *Duffy* by noting that the alleged control group in *Loy* "effectively *conceded* that they collectively owed . . . a fiduciary duty as a group of majority shareholders[.]" *Id.* (emphasis added). As a result, the *Loy* court "did not have the opportunity . . . to address the circumstances under which a group of minority shareholders may effectively combine into a controlling majority, thereby giving rise to a *de facto* fiduciary duty to the remaining minority." *Id.*[6]

78.     Nonetheless, the *Duffy* court discussed indicia that, if present, could support the creation of such a duty in the right circumstances. The first was the company's status as a closely-held family business. *Id.* at 62–63. The second was that the complaining minority shareholder(s) did not "invite[] the majority-shareholder-defendants to purchase their shares[.]" *Id.* at 63. The final one was that "the plaintiffs [sought] involuntary dissolution of the family business" rather than "to

---

[6] Following *Loy*, this Court recognized that, in certain circumstances, "a minority shareholder [may] pursue relief against . . . fellow shareholders who together held a majority interest, served as corporate 'directors and officers,' were 'firmly in control' of the corporation, and had common interests stemming from their related, jointly owned business." *Upchurch v. Sapp*, 2020 NCBC LEXIS 118, at *10 (N.C. Super. Ct. Oct. 8, 2020) (citing *Loy*, 52 N.C. App. at 431); *Flynn v. Pierce*, 2020 NCBC LEXIS 149, at *10–11 (N.C. Super. Ct. Dec. 22, 2020) (same).

negotiate an amicable resolution of [their] ownership interest" in the company. *Id.* (quotation marks omitted).

79. The identified factors do not apply neatly here. While they have been in business together for generations, the shareholders of Chalk & Gibbs belong to two families and are not completely related by blood or marriage. Furthermore, Buff has not sought dissolution of the company but instead argues that he is still an owner and that he attempted, but was prevented from, transferring some of his ownership interest to his son. (Countercls. ¶¶ 157–60.) In short, the record does not reflect that the individual Plaintiffs exercised the necessary "domination and influence" over Buff required for a fiduciary relationship to arise.

80. In addition, before recognizing a fiduciary duty, the *Loy* court looked for evidence that the individual Plaintiffs conspired to act together as a unified control group to divest the minority member of his ownership interest for their personal gains, rather than for the best interest of the business. *Loy*, 52 N.C. App. at 433–35 (reversing directed verdict for defendants because plaintiff sufficiently presented evidence to support a claim for breach of fiduciary duty against his co-owners, three defendants who acted in concert and without notice to drain assets from the business for their own benefit and without the plaintiff receiving his proportionate share); *see also Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68 (2006) (breach of fiduciary duty claim properly before the jury when evidence supported a conclusion that the majority shareholders acted collectively to benefit themselves at the expense of the interest of the minority shareholders); *cf. United States. v. Byrum*, 408 U.S. 125, 137

(1972) ("A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests.").

81.     Similarly, in *Jayawardena v. Daka*, the Court of Appeals, in an unpublished opinion, recognized that a fiduciary relationship could exist when it was based on the formation of a control group "where those shareholders are connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal." No. COA22-384, 2022 N.C. App. LEXIS 935, at *16 (Dec. 29, 2022) (quoting *Dubroff v. Wren Holdings, LLC*, No. CIV.A. 3940-VCN, 2009 Del Ch. LEXIS 89, at *12 (May 22, 2009)).

82.     In this case, Buff fails to identify evidence that the individual Plaintiffs agreed to form a control group and work toward a shared personal goal. "It is not the Court's 'job to sift through the record and make [Defendant's] case for him.' " *Brewster*, 2020 NCBC LEXIS 27, at *9 (quoting *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010)). Instead, the evidence is undisputed that the individual Plaintiffs held meetings to vote on the matters involving Buff, that he received notice of those meetings, and had a right to vote, (B. Chalk Dep. 59:3–16), and that the individual Plaintiffs believed that their actions were taken in the best interest of the corporation rather than to further their personal interests. (Gibbs Dep. 148:21–22.) Under such circumstances, no fiduciary duty arises.

83.     To be sure, there is evidence that the individual Plaintiffs had considered removing Buff from the business for some time prior to their disputes with him over the alleged sexual harassment incident and his position regarding a reduction in the

Lead Producer's commissions. However, the evidence is not that they wanted him out so that they could advance their personal interests. Rather, it is that they had ongoing disagreements with Buff about how to run the business. Among them was Buff's use of the company's petty cash for his own benefit and his decisions regarding how to apply certain fees paid to the company – incidents that caused the individual Plaintiffs to lose trust in Buff's ability to act wisely.

84. Buff's contrary insistence regarding the manner in which they should handle the proposed reduction in commissions, as well as the sexual harassment complaint—both supporting a concern that he had developed some animus toward the Lead Producer—made it difficult for the group to meet together to discuss these matters. Still, they noticed and held both shareholders' and directors' meetings as required by the bylaws, and the record evidence supports a conclusion that these decisions were ultimately made in pursuit of the company's best interest.

85. Under these circumstances, no fiduciary duty arose between Buff and the individual Plaintiffs. Without a fiduciary duty, there can be no claim for breach. Therefore, Plaintiffs' Motion for Summary Judgment on Buff's counterclaim for breach of fiduciary duty shall be **GRANTED**.

C.    **Breach of the Shareholders' Agreement**

86. Buff contends that by resolving to buy his shares in June 2023, Plaintiffs materially breached the condition precedent set forth in paragraph 1(b) of the 2008 Shareholders' Agreement, specifically that "[s]hould a child not be employed by the Corporation at the time his father ceases to be an employee of the Corporation, the

child shall have two years from the father's cessation of employment to become an employee of the Corporation." (2008 Shareholders' Agreement ¶ 1(b).) He argues that the agreement provides that, only after this two-year period, "[t]o the extent that any child should decline to agree to purchase all or any portion of the pro-rata share offered to him or her, such shares shall be reallocated to the remaining Shareholders[.]" (2008 Shareholders' Agreement ¶ 2.)

87.    Buff maintains that because the individual Plaintiffs did not wait two years from the date of his termination to resolve to purchase his shares, the 9 June Resolutions were both ineffective and constitute a breach of the 2008 Shareholders' Agreement. (Def.'s Resp. Br. 26–27.)[7]

88.    Plaintiffs respond that the two-year period is irrelevant because it passed without any of Buff's children (or their spouses) seeking to become employees of the corporation. (Pls.' Resp. Def./Counterclaim Pl.'s Mots. Summ. J. & Partial Summ. J. [Pls.' Resp.] 4–5, ECF No. 66.) They maintain that the only child who was an employee and eligible to receive a gift or transfer of Buff's shares was Buff's son, Bill, but Buff did not accomplish a gift or transfer to Bill prior to Bill's discharge, freeing Plaintiffs to purchase the shares. (Pls.' Resp. 2–3.) Plaintiffs argue that the failure on their part to wait two years before taking action did not cause Buff harm.

89.    Plaintiffs also argue that Buff mischaracterizes the two-year period that must expire before the other shareholders can purchase his shares as an "election

_____

[7] He further argues that even assuming the 9 June Resolutions were valid as to his children, it did not name his children's spouses, who also fell within the definition of "Children" in the 2008 Shareholders' Agreement. (Def.'s Resp. Br. 27–28.) He is correct that the 9 June Resolutions name only some, but not all, of his Children.

period" in which his Children could unilaterally decide to become employees. They point out that any such decision would have to be mutual, and that the individual Shareholders made and documented their decision not to hire the Children on 9 June 2023. (Pls.' Resp. 5–7.)

90. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369 (2005) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)). "Further, a contract's meaning and effect is a question of law for the court—not the jury—when the language of the contract is clear and unambiguous." *Galloway v. Snell*, 384 N.C. 285, 288 (2023) (citations omitted).

91. "A condition precedent is an event which must occur before a contractual right arises, such as the right to immediate performance." *In re Foreclosure of a Deed of Tr. Executed by C & M Invs. of High Point, Inc.*, 346 N.C. 127, 132 (1997) (quoting *In re Foreclosure of Goforth Props., Inc.*, 334 N.C. 369, 375 (1993)).

92. "[T]he existence of such a condition [precedent] depends upon the intent of the parties as gathered from the words they have employed, and it will be interpreted according to general rules of construction." *Farmers Bank, Pilot Mountain v. Michael T. Brown Distribs., Inc.*, 307 N.C. 342, 347 (1983) (quoting 17A C.J.S. *Contracts* § 338, at 318 (1963)).

93. "Conditions precedent are not favored by the law[,]" and "[a]bsent plain language, a contract ordinarily will not be construed as containing a condition precedent." *Craftique, Inc. v. Stevens & Co., Inc.*, 321 N.C. 564, 566–67 (1988)

(citations omitted). However, "the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event." *In re Foreclosure of Goforth Props., Inc.*, 334 N.C. at 376 (citation omitted).

94. Here, Section 1(b) of the 2008 Shareholders' Agreement afforded Buff's Children a two-year period from the date of Buff's discharge to become employees themselves and be eligible to receive a gift or transfer of Buff's shares. Only after that two-year period expired without any of Buff's Children becoming an employee and receiving Buff's shares did the other shareholders have the right to purchase them.

95. The individual Plaintiffs contend that the 9 June Resolutions prevented Buff's Children from ever becoming employees and, therefore, the individual Plaintiffs were not required to wait until the two-year period expired before purchasing the shares. The Court disagrees. The 9 June Resolutions represented the company's position as of 9 June 2023, but nothing prevented the company from changing its position during the two years that followed. Only the passage of time without such a change could have ensured that none of the Children became an employee.[8]

96. Because Plaintiffs' attempted disposition of Buff's shares occurred before the expiration of the two-year period set forth in the 2008 Shareholders' Agreement,

---

[8] Plaintiffs contend that any claim or argument that Buff may transfer shares to his Children within the "two-year election period" is now moot, as more than two years have now passed, and none of them have been employed. (Pls.' Resp. 4.) The argument proves only that that condition precedent has now been satisfied, but it does not foreclose Buff's claim for breach.

it violated the terms of that agreement. Plaintiffs' further argument that even if the 2008 Shareholders' Agreement was breached, no damage resulted is not persuasive. *See Bryan Builders Supply v. Midyette*, 274 N.C. 264, 271 (1968) ("In a suit for damages for breach of contract, proof of the breach would entitle[] the plaintiff to nominal damages at least." (quoting *Bowen v. Fid. Bank*, 209 N.C. 140, 144 (1936))).

97. Accordingly, Defendant's Partial Motion is **GRANTED** as to this breach of the 2008 Shareholders' Agreement, and Plaintiffs' Motion on the same claim is **DENIED**.

98. Buff next argues that because Plaintiffs' breach of the 2008 Shareholders' Agreement by not waiting the requisite two years was a material one, he is relieved of his obligations under the 2008 Shareholders' Agreement, including any obligation to sell his shares. (Def.'s Resp. Br. 25–28.)

99. "The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further." *Yang Real Est. Invs., LLC v. Affordable Mini Storage of Newton, LLC*, 300 N.C. App. 114, 121 (2025) (citing *Coleman v. Shirlen*, 53 N.C. App. 573, 577–78 (1981)). "A material breach is 'one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform.'" *Id.* (quoting *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220 (2015)).

100. "Whether a breach is material or immaterial is ordinarily a question of fact." *Id.* (quoting *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. 190, 198

(2003)). However, "[t]he Court can determine materiality, as a matter of law, where it is clear based on the circumstances that the breach does not constitute 'a substantial failure to perform.' " *Chesson v. Rives*, 2016 NCBC LEXIS 92, at *34 (N.C. Super. Ct. Nov. 30, 2016).

101. In this case, the Court agrees that failure of the individual Plaintiffs to honor the two-year period is a breach, but it is not a material one that goes to the heart of the 2008 Shareholders' Agreement and excuses the parties from their further obligations. *Yang*, 300 N.C. App. at 121 (citing *Supplee*, 239 N.C. at 220).

102. Despite the individual Plaintiffs' misstep, the parties are still able to honor the terms of their agreement. As in *Yang*, "[a]ll essential terms of the parties' contract remain[] intact[.]" *Id.* at 122; *see Combined Ins. Co. of Am. v. McDonald*, 36 N.C. App. 179, 184 (1978) ("We hold that the mere failure of an employer to give the notice of termination of employment provided for in its contract of employment with its employee, nothing else appearing, does not as a matter of law constitute a material breach[.]"); *Chesson,* 2016 NCBC LEXIS 92, at *34 ("The Court concludes that a failure to allow an inspection of books and records, based on the facts of this case, is not a material breach[.]"). Accordingly, Buff, along with the other Shareholders, remains obligated to comply with the terms of the 2008 Shareholders' Agreement.

103. Buff also argues that the 2008 Shareholders' Agreement was breached by the other shareholders' refusal to complete the transfer of five percent (5%) of Buff's stock to Bill prior to Bill's discharge. (Countercls. ¶ 159a.) Pursuant to the 2008 Shareholders' Agreement, "[i]f a child is employed by [Chalk & Gibbs] in good

standing, the father of the child may gift, or otherwise transfer, shares to that child." (2008 Shareholders' Agreement ¶ 1(a).)

104. The evidence is undisputed that, in January 2022, while both Buff and Bill were employed at Chalk & Gibbs, Buff expressed a desire to transfer a portion of his shares to Bill and that James told Buff, "[w]e will get the transfer done." (Ex. 30 at 1.) However, Steve testified that such a transfer could not occur without the written approval of the other three shareholders. (S. Chalk Dep. 66:25–67:3, 136:17–19.) The record does not reflect any written approval, and no stock certificate documenting the transfer was ever created. After careful review of the evidence presented, the Court concludes that genuine issues of material fact exist regarding how the transfer was to be effectuated and why Buff's wishes were not carried out prior to Bill's discharge. Accordingly, Defendant's Partial Motion with respect to this claim for breach of the 2008 Shareholders' Agreement shall be **DENIED**.

105. Lastly, Plaintiffs contend that Buff's claim for any other breach fails because his pleading does not reference the specific provisions of the 2008 Shareholders' Agreement allegedly breached. (Pls.' Supp. Br. 24.) Buff responds that Plaintiffs breached the 2008 Shareholders' Agreement by, among other things, (1) diverting dividends and other distributions away from him; (2) attempting to pay him substantially less for his shares than the purchase price specified in the 2008 Shareholders' Agreement; and (3) refusing to produce the company's financial records. (Countercls. ¶ 159; Def.'s Resp. Br. 29–30; Reply Br. Supp. Def.-

Counterclaimant's Mot. Summ. J. & Mot. Partial Summ. J. [Def.'s Reply] 4–7, ECF No. 77.)

106. While Buff has satisfied the liberal pleading requirements of Rule 8 with respect to these alleged breaches, a review of the record reveals that genuine issues of material fact with respect to each alleged breach remain to be decided, precluding summary judgment. Accordingly, Defendant's Partial Motion with respect to further breaches of the 2008 Shareholders' Agreement shall be **DENIED**.

D. **Breach of the Implied Covenant of Good Faith and Fair Dealing**

107. North Carolina has long recognized that a covenant of good faith and fair dealing is implied in every contract and requires the contracting parties not to "do anything which injures the right of the other to receive the benefits of the agreement." *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 23 (2024) (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985)). It is a "basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Maglione v. Aegis Fam. Health Ctrs.*, 168 N.C. App. 49, 56 (2005) (quoting *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C. App. 743, 746 (1979)).

108. "[W]here a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claims for breach of contract," the former is "part and parcel" of the latter. *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018) (citing *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19 (1996)). In other words, if the breach of contract claim fails, there can be no breach

of the implied covenant based on the same conduct. *See Suntrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821, 833 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts."). However, the converse is also true: "[w]here the breach of contract claim survives, whether the implied covenant was one of the terms breached remains an issue to be determined." *Intersal, Inc. v. Wilson*, 2023 NCBC LEXIS 29, at \*68–69 (N.C. Super. Ct. Feb. 23, 2023).

109. Plaintiffs argue that Buff did not specifically allege a claim for breach of the implied covenant of good faith and fair dealing in his Answer and Counterclaim. (Pls.' Resp. 10.) But the fact that Buff did not label his claim as one for breach of the implied covenant is not dispositive. *See, e.g.*, *Intersal*, 2023 NCBC LEXIS 29, at \*69 ("[T]he implied covenant—the spirit of the agreement—is included in [plaintiff's] claim for breach of contract without the need to identify it specifically.").

110. As stated above, Buff's Partial Motion on his claim for breach of the condition precedent (the two-year period) in Section 1(b) of the 2008 Shareholder's Agreement shall be granted. Likewise, his claim for breach of the implied covenant of good faith and fair dealing on the same basis shall be **GRANTED**. Plaintiffs' Motion with respect to this claim shall be **DENIED**.

E.    **Declaratory Judgment**

111. Lastly, Plaintiffs move for summary judgment to declare that (1) on 9 June 2023, they complied with all terms of the 2008 Shareholders' Agreement for the

purchase of Buff's shares; (2) Buff owned no shares in Chalk & Gibbs as of 9 June 2023; and (3) as of 9 June 2023, the only shareholders in Chalk & Gibbs were James, Len, and Steve. (Am. Compl., *ad damnun* clause ¶¶ 1–3.)

112. Plaintiffs argue that summary judgment on their declaratory judgment claim is appropriate because the record is clear that they have satisfied all provisions of the 2008 Shareholders' Agreement by (1) concluding that Bill did not receive any of Buff's shares by gift or transfer prior to his termination, (2) resolving that Buff's Children could not be employed by Chalk & Gibbs in the succeeding two years, and (3) tendering Buff a promissory note in the amount of $1,238,253.97 for his shares. (Pls.' Br. Supp. 22–24.)

113. Buff responds that it is he who is entitled to judgment as a matter of law on Plaintiffs' claim for declaratory judgment. (Br. Supp. Def.-Counterclaimant's Mot. Summ. J. & Mot. Partial Summ J. [Def.'s Br. Supp.] 7–8, ECF No. 52.)

114. North Carolina's Uniform Declaratory Judgment Act empowers courts "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C.G.S. § 1-253.

115. The Court has determined that Plaintiffs' attempt at a resolution to avoid the two-year period in the 2008 Shareholders' Agreement was ineffective and a breach of that agreement. To that extent, the Court **GRANTS** Buff's Motion and **DENIES** Plaintiffs' Motion. However, genuine issues of material fact regarding the transfer of shares to Bill and the correct valuation of Buff's shares preclude summary judgment with respect to the remaining portions of Plaintiffs' claim for declaratory

judgment. Accordingly, both Buff's and Plaintiffs' Motions with respect to these remaining portions are **DENIED**.

## V.    CONCLUSION

116.    **WHEREFORE**, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Summary Judgment, **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment, **GRANTS in part** and **DENIES in part** Defendant's Partial Motion for Summary Judgment, and **ORDERS** as follows:

a. With respect to Plaintiffs' cause of action for Declaratory Judgment, Defendant's Motion for Summary Judgment is **GRANTED**, but only to the extent that the Court declares that the 9 June Resolutions did not satisfy the two-year period required by Section 1(b) of the 2008 Shareholders' Agreement. In all other respects, Defendant's Motion for Summary Judgment is **DENIED**. Plaintiffs' Motion for Summary Judgment is also **DENIED**.

b. With respect to the counterclaims, Plaintiffs' Motion for Summary Judgment is **GRANTED** with respect to Defendant's first cause of action (Discrimination in Violation of the ADEA), second cause of action (Retaliation in Violation of Title VII), third cause of action (Breach of Fiduciary Duty), and fifth cause of action (Wrongful Discharge in Violation of Public Policy).

c. Also with respect to the counterclaims, Defendant's Partial Motion for Summary Judgment on his fourth cause of action (Breach of

Shareholders' Agreement) is **GRANTED** to the extent Plaintiffs did not allow the two-year period required by Section 1(b) of the 2008 Shareholders' Agreement to expire before resolving to buy Buff's shares on 9 June 2023, and for breach of the implied covenant of good faith and fair dealing. In all other respects, Defendant's Partial Motion is **DENIED**. Plaintiffs' Motion for Summary Judgment with respect to this claim is also **DENIED**.

d. The Court shall set a status conference to determine a trial date in this matter after consultation with counsel.

**SO ORDERED**, this the 9th day of April, 2026.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
for Complex Business Cases